DAVIS, Circuit Judge,
concurring in the judgment:
I concur in the judgment.
In light of the highly persuasive decision of the Seventh Circuit in United States v. Skoien, 614 F.3d 638 (7th Cir.2010) (en banc), pet. for cert, pending, sustaining the constitutionality of 18 U.S.C. § 922(g)(9), the district court should have no difficulty in concluding that the application of § 922(g)(9) to offenders such as Chester passes Second Amendment scrutiny, exactly as district courts have already concluded. See United States v. Smith, 2010 WL 3743842 (S.D.W.Va. Sept.20, 2010) (applying Skoien and sustaining statute); United States v. Staten, 2010 WL 3476110 (S.D.W.Va. Sept.2, 2010) (same).
*684 I.
On April 26, 2004, Chester savagely attacked his 22-year-old daughter, Meghan Chester (“Meghan”). Apparently, their dispute arose over what Meghan had eaten for lunch that day. In this attack, Chester slammed his daughter on the kitchen table. Meghan attempted to leave but Chester followed her, threatened her, and punched her in the face. Meghan fell to the floor in pain, but Chester continued to attack her. He began kicking her as she lay on the ground, and also dumped buckets of water over his daughter’s head. After her father “beat her up and assault[ed] her” for some time, J.A. 41, Meghan escaped from her father and locked herself in the bathroom. Eventually, Chester left the residence and Meghan’s mother took Meghan to the hospital. Meghan had a swollen nose and a knot on her forehead. Based on his physical abuse of his daughter, on February 4, 2005, Chester was convicted in state court in Kanawha County, West Virginia for the misdemeanor crime of domestic battery and domestic assault in violation of W. Va.Code § 61-2-28(a) & (b).
On October 10, 2007, the Kanawha County police returned to the Chester family home in response to a second domestic violence call. This time, the call was placed by Mrs. Linda Guerrant-Chester (“Guerrant-Chester”), Chester’s then-wife. When the officers arrived, Guerrant-Chester told them that she awoke at 5:00 a.m. and discovered her husband outside the house, receiving oral sex from a prostitute. When Chester realized that Guerrant-Chester had seen him, he yelled, “[s]o you fucking caught me” and proceeded to drag Guerrant-Chester inside the house. Once inside, Chester grabbed Guerrant-Chester’s face and throat and strangled her while repeatedly shouting “I’m going to kill you!” Chester’s daughter, Samantha Chester, heard Chester repeatedly threaten to kill Guerrant-Chester and came to the kitchen. She attempted to calm Chester down, and while she distracted him, Guerrant-Chester called the police. When the police arrived, they located a loaded 12-gauge shotgun in the kitchen pantry and a 9mm pistol in the defendant’s bedroom. Both firearms belonged to Chester.
II.
On May 6, 2008, a federal grand jury indicted Chester for violating 18 U.S.C. § 922(g)(9). Chester moved to dismiss the indictment, and after considering the parties’ arguments in light of the- Supreme Court’s opinion in District of Columbia v. Heller, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), the district court denied Chester’s motion. In the district court’s brief written opinion, it cited Heller ’s observation that “nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill.... ” J.A. 60 (citing Heller, 128 S.Ct. at 2816-17). The court then drew an analogy between non-violent felons and domestic violence misdemeanants, finding that the Heller language could, and in this case, should, be read to include both. The court analyzed the issue as follows:
The thrust of the majority opinion in Heller leaves ample room for the government to control the possession of firearms by misdemeanants found guilty of domestic violence. Indeed, the need to bar possession of firearms by domestic violence misdemeanants in order to protect family members and society in general from potential violent acts of such individuals is quite often far greater than that of the similar prohibition of § 922(g)(1) on those who commit nonviolent felonies.
J.A. 61.
Chester then entered a conditional guilty plea, preserving his right to appeal *685 the district court’s denial of his motion to dismiss. He was sentenced to five months in prison, followed by a three-year term of supervised release. J.A. 5. Chester timely appealed; we have jurisdiction pursuant to 28 U.S.C. § 1291.
III.
A.
The majority holds that, “[although Chester asserts his right to possess a firearm in his home for the purpose of self-defense, we believe his claim is not within the core right identified in Heller — the right of a law-abiding, responsible citizen to possess and carry a weapon for self-defense.” Maj. Op. at 682-83. I agree. The majority further notes, however, “We cannot conclude on this record that the government has carried its burden of establishing a reasonable fit between the important object of reducing domestic gun violence and § 922(g)(9)’s permanent disarmament of domestic-violence misdemeanants.” Id. at 683. I do not agree that the issue presented is whether § 922(g)(9), on its face, properly regulates “domestic-violence misdemeanants” as a group. This case is only about a congressional prohibition imposed on Appellant William Samuel Chester, Jr. More generally, I have concerns about the majority’s invitation to import First Amendment doctrines into Second Amendment jurisprudence. But in any event, I am confident that the district court will have no difficulty satisfying the majority’s mandate.
B.
Section 922(g)(9) was enacted in 1996 along with 18 U.S.C. § 922(g)(8) as part of the so-called Lautenberg Amendment to the Gun Control Act. It states, in pertinent part:
(g) It shall be unlawful for any person—
(9) who has been convicted in any court of a misdemeanor crime of domestic violence, to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.
18 U.S.C. § 922(g)(9). The term “misdemeanor crime of domestic violence” is defined as follows:
(A) Except as provided in subparagraph (C), the term “misdemeanor crime of domestic violence” means an offense that-
(i) is a misdemeanor under Federal, State, or Tribal law; and
(ii) has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon, committed by a current or former spouse, parent, or guardian of the victim, by a person with whom the victim shares a child in common, by a person who is cohabiting with or has cohabited with the victim as a spouse, parent, or guardian, or by a person similarly situated to a spouse, parent, or guardian of the victim.
(B) (i) A person shall not be considered to have been convicted of such an offense for purposes of this chapter, unless-
(I) the person was represented by counsel in the case, or knowingly and intelligently waived the right to counsel in the case; and
(II) in the case of a prosecution for an offense described in this paragraph for which a person was entitled to a jury trial in the jurisdiction in which the case was tried, either
(aa) the case was tried by a jury, or
*686 (bb) the person knowingly and intelligently waived the right to have the case tried by a jury, by guilty plea or otherwise.
(ii) A person shall not be considered to have been convicted of such an offense for purposes of this chapter if the conviction has been expunged or set aside, or is an offense for which the person has been pardoned or has had civil rights restored (if the law of the applicable jurisdiction provides for the loss of civil rights under such an offense) unless the pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.
18 U.S.C. § 921(a)(33) (emphasis added). Thus, a defendant must use or attempt to use force before he is convicted of “a misdemeanor crime of domestic violence” under 18 U.S.C. § 922(g)(9).
C.
As has been amply discussed, in Heller, the Supreme Court invalidated a gun ban in the District of Columbia, holding that the Second Amendment guarantees to law-abiding citizens the right to possess handguns for the purposes of self-defense. The Court identified the right to self-defense as “the central component of the right itself,” Heller, 128 S.Ct. at 2802, and it declared that the “core right” preserved by the Second Amendment was the right for “law-abiding, responsible citizens to use arms in defense of hearth and home.” Id. at 2821. Heller failed, however, to identify the proper standard of scrutiny for analyzing whether a statute that regulates gun possession infringes on Second Amendment rights, instead finding that the D.C.’s outright ban on possession would fail to survive under any “of the standards of scrutiny that we have applied to enumerated constitutional rights.” Id. at 2817.
The Court acknowledged the existence of limits on the scope of the individual right protected by the Second Amendment, and explained that certain so-called “longstanding prohibitions” were “presumptively lawful regulatory measures.” Id. at 2816-17 & n. 26; id. at 2816 (“From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.”). The Court provided a nonexclusive, illustrative list of such “presumptively lawful” exceptions, including but not limited to “longstanding prohibitions on the possession of firearms by felons and the mentally ill,” id. at 2816-17, but did not explain how lower courts were to identify other such “presumptively lawful” exceptions. More recently, the Court restated its belief in the existence of “presumptively lawful” regulations but again declined to provide any guidance to lower courts in our efforts to identify them. McDonald v. Chicago, — U.S. -, 130 S.Ct. 3020, 3047, 177 L.Ed.2d 894 (2010) (holding that the Second Amendment constrains state and local laws through its incorporation under the Fourteenth Amendment Due Process Clause).[1] Post-Heller, and now, post-McDonald, lower *687 federal courts have theorized about the meanings of a “longstanding prohibition[ ]” and a “presumptively lawful regulatory measure[]”, but, as the majority candidly concedes, no consensus has emerged.
D.
The majority, on the basis of “the [Heller] Court’s frequent references to First Amendment doctrine, ... look[s] to the First Amendment as a guide” in its analysis. Maj. Op. at 682. To be sure, Heller does refer to the First Amendment, but only for several quite limited purposes: (1) to compare its language, along with that of other amendments in the Bill of Rights, to the language of the Second Amendment, see, e.g., Heller, 128 S.Ct. at 2790; (2) to establish that constitutional rights are not limited to the use of equipment available at the time of ratification, but extend to modern analogues, see id. at 2791 (citing to First Amendment’s protection of “modern forms of communication”); (3) to make the simple point that unqualified constitutional language does not imply an “unlimited” right, id. at 2799; (4) to note that initial recognition of a right sometimes comes long after ratification, see id. at 2816; and finally, (5) to remind its audience that our constitutional rights are “the very product of an interest-balancing by the people” and thus that balancing them away in the manner ascribed to Justice Breyer would be inappropriate, id. at 2821. Certainly the First Amendment, as a fount of rights the dissenting Justices have frequently championed, was a useful source for the Heller majority. But these limited references are hardly an invitation to import the First Amendment’s idiosyncratic doctrines wholesale into a Second Amendment context, where, without a link to expressive conduct, they will often appear unjustified. To the extent some commentators and courts, frustrated with Heller’s lack of guidance, have clung to these references and attempted to force unwieldy First Amendment analogies, they muddle, rather than clarify, analysis.
1.
Most problematic is the majority’s suggestion that the government must show “a reasonable fit between the important object of reducing domestic gun violence and § 922(g)(9)’s permanent disarmament of domestic-violence misdemeanants” as a class. Maj. Op. at 683. Chester can plainly challenge the statute as applied to him. And insofar as any legislative enactment may be attacked on its face on the grounds “that no set of circumstances exists under which the Act would be valid,” United States v. Salerno, 481 U.S. 739, 746, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987); see also Greenville Women’s Clinic v. Bryant, 222 F.3d 157, 164 (4th Cir.2000) (quoting Salerno and applying this rule in the abortion-regulation context), Chester may raise that claim as well. But Chester cannot simply complain that, while the statute is permissible as applied to him, there may be different sets of facts under which its application would be invalid.
This “second type of facial challenge,” United States v. Stevens, — U.S. -, 130 S.Ct. 1577, 1587, 176 L.Ed.2d 435 (2010), which presumes “a species of third party (721s tertii) standing,” City of Chicago v. Morales, 527 U.S. 41, 55 n. 22, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (Stevens, J., concurring), has not been permitted outside of the First Amendment context, see Salerno, 481 U.S., at 745, 107 S.Ct. 2095 (“The fact that [a statute] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since we have not recognized an ‘overbreadth’ doctrine outside the limited context of the- First Amendment.”). As the Supreme Court *688 taught in Broadrick v. Oklahoma, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973),
Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court.... [These principles] rest on more than the fussiness of judges. They reflect the conviction that under our constitutional system courts are not roving commissions assigned to pass judgment on the validity of the Nation’s laws.
Id. at 610-11, 93 S.Ct. 2908.
One of the only exceptions to this rule is the First Amendment’s overbreadth doctrine, which is justified on grounds unique to the regulation of expressive conduct. Concerned about the chilling effect of overly broad regulations — the fear that a “statute’s very existence may cause others not before the court to refrain from constitutionally protected speech or expression,” id. at 612, 93 S.Ct. 2908 — the Supreme Court has “long ... recognized that the First Amendment needs breathing space,” id. at 611, 93 S.Ct. 2908; and the over-breadth doctrine is the Court’s solution to this speech-specific problem, id. at 611-12, 93 S.Ct. 2908. With free expression, the classes of protected speech that are unduly burdened may be quite particularized— e.g., unpopular expression that has “serious literary, artistic, politics, or scientific value,” Miller v. California, 413 U.S. 15, 24, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). And as expression is, by its very nature, so mutable, overbroad regulations can easily encourage speakers to modify their speech, shifting it away from controversy. No analogous arguments obtain in the Second Amendment context. As there can be little doubt that advocates of a robust individual right to bear arms will continue to challenge all firearm regulations, importing the over-breadth doctrine, an “extraordinary” exception to prudential standing requirements, Ward v. Rock Against Racism, 491 U.S. 781, 794, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989), into the Second Amendment context would be inappropriate.
2.
As for the majority’s observation that here “we are seeking to determine whether a person, rather than the person’s conduct, is unprotected by the Second Amendment,” Maj. Op. at 680, I am dubitante. This seems to invite a comparison to the First Amendment’s application to expressive conduct and to suggest that, because here we would exclude a “person, rather than the person’s conduct,” from constitutional immunity, the government should bear a heavier burden in establishing that Chester’s claim is outside the purview of the Second Amendment. Again, however, the First Amendment analogy breaks down. The law has long believed that “no danger flowing from speech can be deemed clear and present, unless the incidence of the evil apprehended is so imminent that it may befall before there is opportunity for full discussion,” and that “the remedy to be applied is more speech, not enforced silence.” Whitney v. California, 274 U.S. 357, 377, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (Brandéis, J., concurring). This principle has no application to gun violence, and prohibiting violent criminals from owning guns cannot fairly be compared to permanently silencing some class of persons.
E.
Heller has left in its wake a morass of conflicting lower court opinions regarding the proper analysis to apply to challenged *689 firearms regulations. Many courts have upheld provisions of § 922(g) under the “presumptively lawful regulatory measure! ]” or the “longstanding prohibition! ]” language in Heller. These courts generally affirm a particular provision of § 922(g) either because Heller specifically stated the particular regulations were constitutional, as regarding felons and the mentally ill, §§ 922(g)(1) & (4), or, as did the district court here, via analogy to the so-called “presumptively lawful regulatory measures.”[2] Other federal courts have individually analyzed the specific statutory provision at issue, determined the appropriate level of constitutional scrutiny, and then analyzed the statute in light of the factual circumstances before the court.[3]
Recognizing that an attempt to operationalize the Heller Court’s “longstanding” language would lead to “weird” results unconnected even to any court’s divination of the ratifiers’ original intent, the Seventh Circuit simply read this language to acknowledge that “exclusions [from Heller’s qualified right to bear arms] need not mirror limits that were on the books in 1791.” Id. at 641, 128 S.Ct. 2783. I, too, find this the most persuasive interpretation of that passage in Heller.
The Skoien court then conducted a further analysis to determine whether the statute was constitutional. The court did not explicitly adopt a level of constitutional scrutiny, however. Instead, the court embraced the government’s concession that “some form of strong showing (‘intermediate scrutiny,’ many opinions say) is essential, and that § 922(g)(9) is valid only if substantially related to an important governmental objective.” Skoien, 614 F.3d at 641. Then, after disavowing involvement in the “ ‘levels of scrutiny’ quagmire,” the court concluded that § 922(g)(9) satisfied the appropriate test, a test that appears to any discerning eye identical to intermediate scrutiny. Id. at 641-42 (“[F]or no one doubts that the goal of § 922(g)(9), pre *690 venting armed mayhem, is an important government objective. Both logic and data establish a substantial relation between § 922(g)(9) and this objective.”). The court went on to explain why the statute satisfied intermediate scrutiny, identifying three distinct justifications for the constitutionality of § 922(g)(9): domestic abusers often commit acts that would be charged as felonies if the victim were a stranger, but that are charged as misdemeanors because the victim is a relative; (2) firearms are deadly in domestic strife; and (3) persons convicted of domestic violence are likely to offend again. Id. at 643^14. Distilled to its essence, Skoien holds that § 922(g)(9) passes muster under the Second Amendment as applied to recidivist violent offenders.
IV.
Despite its hesitation to do so explicitly (in contrast to the majority in this case), the Seventh Circuit correctly applied intermediate scrutiny in Skoien and correctly sustained § 922(g)(9) against constitutional attack.
A.
Intermediate scrutiny is the proper level of scrutiny for § 922(g)(9). Heller eliminated rational basis scrutiny and Justice Breyer’s proposed balancing test as possibilities. Heller, 128 S.Ct. at 2817 n. 27; id. at 2821. The Court also made it clear that strict scrutiny is unwarranted in Second Amendment analysis. See id. at 2851 (Breyer, J., dissenting). Moreover, it is clear here that § 922(g)(9) does not even burden the core right of the Second Amendment as established by the Supreme Court in Heller, namely, the right for “law-abiding, responsible citizens to use arms in defense of hearth and home.” Id. at 2821. Undisputedly, those convicted for having committed violent assaults against cohabitants and family members in general, and Chester in particular, are not law-abiding, responsible citizens. Chester had been convicted of a serious crime in which violence is an element, 18 U.S.C. § 922(g)(9); W. Va.Code § 61-2-28(a) & (b), and in which the facts indicate that he acted particularly violently: he lashed out at his daughter, kicking and punching her, at times while she was on the ground. Further, our own precedent dictates that an individual who assaulted a family member thereby “ ‘removed himself from the class of ordinary citizens’ to the point where he could not ‘reasonably expect to be free from regulation when possessing a firearm,”’ United States v. Mitchell, 209 F.3d 319, 323 (4th Cir.2000) (quoting United States v. Bostic, 168 F.3d 718, 722 (4th Cir.1999)), separately suggesting that strict scrutiny is inapplicable to Chester because of his previous criminal activity. For all these reasons, intermediate scrutiny is the proper approach for the district court’s analysis.
Intermediate scrutiny queries whether a statute is substantially related to an important governmental interest. See Craig v. Boren, 429 U.S. 190, 197, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (“To withstand constitutional challenge, previous cases establish that classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives.”); see also Lehr v. Robertson, 463 U.S. 248, 265-66, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983) (“The sovereign may not draw distinctions between individuals based solely on differences that are irrelevant to a legitimate governmental objective.... when there is no substantial relation between the disparity and an important state purpose”) (internal citations omitted); Adkins v. Rumsfeld, 464 F.3d 456, 468 (4th Cir. 2006) (for facially neutral gender-based *691 classifications we demand “at least that the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives.”); cf. Skoien, 614 F.3d at 642.
The government contends that the governmental interests at stake here, and, indeed, the very purpose of § 922(g)(9), include, inter alia, to “keep[] firearms away from presumptively risky persons.” Appellee’s Br. at 9. I readily agree. Mitchell, 209 F.3d at 321 (“Congress determined that the possession of a gun by one convicted of domestic violence put the possessor’s partner at undue risk.”). In enacting legislation which prohibits certain classes of persons from possessing firearms, “Congress sought to rule broadly to keep guns out of the hands of those who have demonstrated that ‘they may not be trusted to possess a firearm without becoming a threat to society.’ ” Scarborough v. United States, 431 U.S. 563, 572, 97 S.Ct. 1963, 52 L.Ed.2d 582 (1977) (quoting 114 Cong. Rec. 14773 (1968)).
More specifically, the government argues that the purpose of § 922(g)(9) is to keep firearms away from presumptively risky individuals with a demonstrated history of actual or attempted violence. Appellee’s Br. at 10-13. Again, the government’s argument is persuasive. In 1996, Congress recognized that existing felon-in-possession prohibitions were not keeping firearms out of the hands of domestic abusers, because such individuals, although dangerous, were often charged with misdemeanors instead of felonies. 142 Cong. Rec. S2646-02 (1996) (statement of Sen. Lautenberg) (explaining that “many people who engage in serious spousal or child abuse ultimately are not charged with convicted of felonies ... and these people are still free under Federal law to possess firearms”). Thus, Congress enacted § 922(g)(9) to deny these violent offenders the right to possess guns. Hayes, 129 S.Ct. at 1087 (finding that “[fjirearms and domestic strife are a potentially deadly combination nationwide.”); 142 Cong. Rec. at S2646-02 (explaining that adding domestic violence misdemeanants to the Gun Control Act of 1968 in 1996 was intended to “close this loophole, and will help keep guns out of the hands of people who have proven themselves to be violent and a threat to those closest to them.”); see also United States v. Beavers, 206 F.3d 706, 710 (6th Cir.2000) (“[I]t should not surprise anyone that the government has enacted legislation in an attempt to limit the means by which persons who have a history of domestic violence might cause harm in the future”).
Under intermediate scrutiny, the governmental purpose must be important. But who could possibly dispute the importance of the governmental interest in keeping firearms away from individuals with a demonstrated history of actual or attempted assaultive violence? The need to protect victims of assaultive domestic violence from further, more lethal harm from gun violence is unquestionable; its unfortunate and horrifying effects are well-documented. As the government argues:
Domestic violence misdemeanants, even more so than most convicted felons, have demonstrated a specific propensity for violence and thus pose and unacceptable risk of firearm misuse. Such persons have demonstrated an unwillingness or inability to resolve domestic disputes without threats of physical violence. Just because a domestic abuser does not employ a firearm in this first instance does not mean he will refrain from using a firearm the next time. Further, because victims of domestic violence often seek assistance from law *692 enforcement agencies, domestic violence misdemeanants are likely to encounter law enforcement officers. The United States interest includes eliminating firearm possession by domestic violence misdemeanants during adverse encounters with law enforcement officers.
Appellee’s Br. at 12. And sound research of unquestionable reliability (much of it empirical) indicates that the presence of firearms greatly increases the risk of death for women suffering from domestic abuse. For example, in 2006,1,905 women were murdered with guns and 4,772 women were treated in emergency rooms for gunshot wounds stemming from an assault.[4] On average, more than three women in the United States are murdered by their husbands or boyfriends every day.[5] Abused women living in homes with firearms are six times more likely to be killed than other abused women} Women are more than twice as likely to be shot to death by their male partner as killed in any way by a stranger.[6]
[7] And women living in homes with guns are more than three times as likely to be victims of homicide.[8] Although it is the government’s role to provide these data, courts have long taken judicial notice of dispositive facts in constitutional cases; judicial notice of the data underlying the government’s interests is entirely appropriate.
It is also quite clear that § 922(g)(9) is substantially related to the government’s important interests, as the statute directly prohibits the possession of firearms by those with a demonstrated history of actual or attempted violence. See American Life League, Inc. v. Reno, 47 F.3d 642, 651-52 (4th Cir.1995). Section 922(g)(9) is not merely intended to accomplish bureaucratic shortcuts or administrative convenience. Craig v. Boren, 429 U.S. 190, 198-99, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), reh’g denied, 429 U.S. 1124, 97 S.Ct. 1161, 51 L.Ed.2d 574 (1977); Reed v. Reed, 404 U.S. 71, 76, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971), mandate conformed to, 94 Idaho 542, 493 P.2d 701 (1972). This statute, simply stated, is substantially related to the goal proffered by the government: to keep firearms from individuals with a demonstrated history of violence. This statute was intended to prevent individuals like William Samuel Chester, Jr., a violent man who has attacked and assaulted his own daughter and wife, from purchasing or possessing guns. Thus, based on readily available data of undoubted reliability, § 922(g)(9) satisfies intermediate scrutiny and is therefore constitutional.
*693 V.
I can foresee no difficulty for the district court in sustaining the constitutional validity of the application of § 922(g)(9) in this case. Nevertheless, under the circumstances of the law’s understandably slow evolutionary course of development, I am content to give Appellant Chester a full opportunity to offer evidence and argument showing the district court how and why he escapes the law’s bite.

. The Court stated:
We made it clear in Heller that our holding did not cast doubt on such longstanding regulatory measures as “prohibitions on the possession of firearms by felons and the mentally ill,” "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.” We repeat those assurances here.
McDonald, 130 S.Ct. at 3047 (internal citations omitted).

. We have upheld the statutory prohibitions on possession by felons and the mentally ill after Heller in unpublished, non-precedential, cases. United States v. Brunson, No. 07-4962, 292 Fed.Appx. 259, *261 (4th Cir. Sept.11, 2008) (upholding § 922(g)(1)); United States v. McRobie, No. 08-4632, 2009 WL 82715, *1 (4th Cir. Jan.14, 2009) (upholding § 922(g)(4)). Other circuits concluded similarly. See, e.g., United States v. Anderson, 559 F.3d 348, 352 (5th Cir.2009) (upholding § 922(g)(1)); United States v. McCane, 573 F.3d 1037, 1047 (10th Cir.2009) (same); United States v. Stuckey, No. 08-0291, 317 Fed. Appx. 48, 50 (2d Cir. March 18, 2009) (same).
We have also previously analogized between perpetrators of domestic violence and felons. United States v. Bostic, 168 F.3d 718, 722 (4th Cir.1999). There, Bostic challenged the constitutionality of his conviction under § 922(g)(8). We upheld the statute, explaining:
We disagree, however, with Bostic’s premise that he remained an “ordinary citizen" after the [final protection] Order was entered against him. By engaging in abusive conduct toward Kelly and Ryan which led to the entry of the Order, Bostic removed himself from the class of ordinary citizens we discussed in Langley. Like a felon, a person in Bostic’s position cannot reasonably expect to be free from regulation when possessing a firearm.
Id. at 722 (emphasis added).
Other federal courts have upheld § 922(g)(9) based on analogies between domestic violence misdemeanants and felons. E. g., United States v. White, 593 F.3d 1199, 1205 (11th Cir.2010); United States v. Booker, 570 F.Supp.2d 161, 163-64 (D.Me.2008) ("if anything, as a predictor of firearm misuse, the definitional net cast by 922(g)(9) is tighter than the net cast by 922(g)(1).... [and] the manifest need to protect the victims of domestic violence and to keep guns from the hands of the people who perpetuate such acts is well-documented and requires no further elaboration.").

. See, e.g., United States v. Miller, 604 F. Supp.2d 1162, 1171 (W.D.Tenn.2009); United States v. Engstrum, 609 F.Supp.2d 1227, 1231-34 (D.Utah 2009).

. CDC, Nat'l Ctr. for Injury Prevention & Control, Injury Mortality Reports, http:// webappa.cdc.gov/sasweb/ncipc/mortratelO_ sy.html (query for "Homicide” and "Firearm” and "Females” and "2006”); Id., Nonfatal Injury Reports, http://webappa.cdc.gov/ sasweb/ncipc/nfirates2001.html (query for "Assault-All” and "Firearm” and "Females” and "2006”).

. U.S. Dep't of Justice, Bureau of Justice Statistics Crime Data Brief, Intimate Partner Violence, 1976-2001 (Feb. 2003), available at http ://www. endabuse. org/userfiles/file/ Children_and_Families/Children.pdf.

. Jacquelyn C. Campbell et al., Assessing Risk Factors for Intimate Partner Homicide, Nat'l Inst. Just. J., Nov. 2003, at 15, 16, available at http://www.ncjrs.gov/pdffilesl/jr000250e.pdf. In another study, it was found that access to firearms increases the risk of intimate-partner homicide more than five-fold. Arthur L. Kellerman et al., Gun Ownership as a Risk Factor for Homicide in the Home, 329 New Eng. J. Med. 1084-91 (1993).

. Arthur L. Kellerman & James A. Mercy, Men, Women, and Murder: Gender-Specific Differences in Rates of Fatal Violence and Victimization, 33 J. Trauma 1, 1 (1992).

. James E. Bailey et al., Risk Factors for Violent Death of Women in the Home, 157 Archives of Internal Med. 777, 777 (1997).