FILED
United States Court of Appeals
Tenth Circuit

May 7, 2012

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

EMMANUEL HUITRON-GUIZAR,

    Defendant - Appellant.

No. 11-8051

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING
(D.C. No. 1:11-CR-00072-WFD-1)**

---

Ronald Pretty, Cheyenne, Wyoming, for Defendant - Appellant.

Todd Shugart, Assistant United States Attorney, (and Christopher A. Crofts, United States Attorney, on the brief), Casper, Wyoming, for Plaintiff - Appellee.

---

Before **BRISCOE**, Chief Judge, **HOLLOWAY**, and **KELLY**, Circuit Judges.

---

**KELLY**, Circuit Judge.

---

    Defendant-Appellant Emmanuel Huitron-Guizar entered a conditional guilty plea to being an illegal alien in possession of firearms transported or shipped in interstate commerce, 18 U.S.C. §§ 922(g)(5)(A), 924(a)(2), and was

sentenced to 18 months' imprisonment.  Mr. Huitron-Guizar is to be delivered upon release to an immigration official for deportation.  On appeal, he argues that § 922(g)(5)(a) is unconstitutional and that the district court committed various sentencing errors in applying the Sentencing Guidelines.  We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), and we affirm.

Background

Mr. Huitron-Guizar was born in Mexico and brought to Wyoming at age three.  In March 2011, officers executed a warrant on his home and discovered three firearms—a 7.62x39mm rifle, a 12-gauge semi-automatic shotgun, and a Smith & Wesson semi-automatic pistol.  They learned from his sister that Mr. Huitron-Guizar, now 24 years old, was, unlike her, not a U.S. citizen.  The district court denied his motion to dismiss the indictment on grounds that § 922(g)(5) unconstitutionally abridges the right to bear arms as interpreted in District of Columbia v. Heller, 554 U.S. 570 (2008), and violates the Fourteenth Amendment's Equal Protection Clause (which applies to the federal government through the Fifth Amendment's Due Process Clause).  The district court also declined to apply a lower "sporting purposes" base offense level, U.S.S.G. § 2K2.1(b)(2), or to depart or vary downward based upon Mr. Huitron-Guizar's age and allegations of governmental misconduct.

## Discussion

The constitutionality of a federal statute is reviewed de novo, United States v. Carel, 668 F.3d 1211, 1216 (10th Cir. 2011). Challenges to a sentence's substantive reasonableness are reviewed for abuse of discretion; legal or procedural conclusions about the Guidelines are reviewed de novo. United States v. McComb, 519 F.3d 1049, 1053 (10th Cir. 2007).

A.      Second Amendment and Equal Protection Challenges

Heller held that the Second Amendment protects an individual right to possess a firearm, unconnected with service in a militia, and to use that firearm for traditionally lawful purposes, like self-defense within the home. This right was understood by eminent authorities like William Blackstone and James Wilson as but an application of the natural right of self-preservation. 554 U.S. at 593-94, 585. Yet no right is absolute. The right to bear arms, however venerable, is qualified by what one might call the "who," "what," "where," "when," and "why." For instance, it is unlawful to knowingly receive guns with obliterated serial numbers, see 18 U.S.C. § 922(k); United States v. Marzzarella, 614 F.3d 85, 100-01 (3d Cir. 2010). A juvenile, with some exceptions, cannot possess a handgun, see 18 U.S.C. §922(x), United States v. Rene E., 583 F.3d 8, 16 (1st Cir. 2009). An airline passenger may not carry aboard a concealed firearm, see 49 U.S.C. §46505, United States v. Davis, 304 F. App'x. 473 (9th Cir. 2008). Nor may a drug dealer use or carry a weapon to protect his stash, see 18 U.S.C. §

924(c), <u>United States v. Jackson</u>, 555 F.3d 635, 636 (7th Cir. 2009).

Our issue concerns the "who." Section 922(g), a part of the amended Gun Control Act of 1968, forbids gun possession by nine classes of individuals: felons, fugitives, addicts or users of controlled substances, the mentally ill, illegal and non-immigrant aliens, the dishonorably discharged, renouncers of their citizenship, those subject to court orders for harassing, stalking, or threatening intimate partners or their children, and those convicted for misdemeanor domestic violence. No Second Amendment challenge since <u>Heller</u> to any of these provisions has succeeded. <u>See, e.g.</u>, <u>United States v. McCane</u>, 573 F.3d 1037, 1047 (10th Cir. 2009) (felons); <u>In re U.S.</u>, 578 F.3d 1195, 1200 (10th Cir. 2009) (misdemeanor domestic violence); <u>United States v. Richard</u>, 350 F. App'x. 252, 260 (10th Cir. 2009) (drug users); <u>United States v. Reese</u>, 627 F.3d 792, 802-04 (10th Cir. 2010) (domestic protection order). Last year, the instant provision, on illegal aliens, was upheld against Second Amendment challenge by the Fifth Circuit, <u>United States v. Portillo-Munoz</u>, 643 F.3d 437, 442 (5th Cir. 2011), and the Eighth Circuit, <u>United States v. Flores</u>, 663 F.3d 1022 (8th Cir. 2011).

Mr. Huitron-Guizar agrees that those guilty of serious crimes and the mentally ill are sensibly stripped of firearms they might otherwise lawfully keep. Yet he wonders what it is about aliens that permits Congress to impose what he considers a similar disability? The starting point to any answer was given by Justice Jackson in <u>Johnson v. Eisentrager</u>, 339 U.S. 763, 770 (1950):

- 4 -

The alien, to whom the United States has been traditionally hospitable, has been accorded a generous and ascending scale of rights as he increases his identity with our society. Mere lawful presence in the country creates an implied assurance of safe conduct and gives him certain rights; they become more extensive and secure when he makes preliminary declaration of intention to become a citizen, and they expand to those of full citizenship upon naturalization.

This ascending scale of constitutional rights is elaborate. An alien outside the country has fewer rights than one within, e.g., an alien held at the border has no right to a deportation hearing. Shaughnessy v. Mezei, 345 U.S. 206, 212 (1953). An unlawfully present alien has fewer rights than one lawfully here; an illegal alien generally has no right to assert a selective-enforcement claim to thwart deportation. Reno v. American-Arab Anti-Discrimination Comm., 525 U.S. 471, 488 (1999). A lawful alien here fewer than five years can be denied enrollment in Medicare, unlike one here for, say, a decade. Mathews v. Diaz, 426 U.S. 67, 87 (1976). A *temporary* resident alien has fewer rights than a *permanent* resident alien; the former, for example, may be barred from making campaign contributions. Bluman v. Fed. Election Comm'n, 800 F. Supp. 2d 281, 288 (D.D.C. 2011, *aff'd* 132 S.Ct. 1087 (2012). Likewise, a lawful permanent resident has fewer rights than a citizen, since a state can form a citizens-only police force. Foley v. Connelie, 435 U.S. 291, 300 (1978). Finally, one right is limited to natural born citizens: eligibility to run for president. U.S. Const., Art. II, § 1, cl. 5. The line separating lawful and unlawful aliens is often as bright as that between aliens and citizens.

Mr. Huitron-Guizar's implicit Equal Protection argument is that Congress does not have power to "discriminate against non-citizens by not allowing them to have all the constitutional rights that United States citizens have." Aplt. Br. 16. This is not correct. Federal statutes that classify based on alienage need only a rational basis; they flow from plenary powers over admission, exclusion, naturalization, national security, and foreign relations. Mathews v. Diaz, 426 U.S. at 81. The Court has "firmly and repeatedly endorsed the proposition that Congress may make rules as to aliens that would be unacceptable if applied to citizens." Demore v. Kim, 538 U.S. 510, 522 (2003). Mr. Huitron-Guizar cannot meet his burden of showing that there is *no* rational relationship (more below) between the classification and a legitimate government end. Equal protection requires that similarly situated individuals be treated similarly; aliens, let alone those unlawfully here, are simply not situated like citizens.

More vexing is the Second Amendment claim. Until last year the federal alien-in-possession statute had not been challenged in a U.S. Court of Appeals under Heller. Does that amendment even protect illegal aliens? It provides: "A well regulated Militia, being necessary to the security of a free State, the *right of the people* to keep and bear Arms, shall not be infringed." (Emphasis added.) We know that the Fifth Amendment applies to illegal aliens within our territory because it provides that "No *person* shall be...." Kwong Hai Chew v. Colding, 344 U.S. 590, 596-98 (1953). So does the Sixth Amendment, which protects the

- 6 -

"accused," who could be a citizen—or not.  Wong Wing v. United States, 163 U.S. 228, 238 (1896).  We also know that the Fourteenth Amendment's Due Process and Equal Protection Clauses apply to "any person."  Yick Wo v. Hopkins, 118 U.S. 356, 369 (1886); Plyer v. Doe, 457 U.S. 202, 210 (1982).

Yet the meaning of "the people" is less clear.  The only Supreme Court case to scrutinize the phrase is United States v. Verdugo-Urquidez, 494 U.S. 259 (1990), which considered the right of aliens (lawful or not) to the protections of the Fourth Amendment, another "right of the people."  The Court wrote:

> '[T]he people' seems to have been a term of art employed in select parts of the Constitution.... [Its uses] sugges[t] that 'the people' protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.

Id. at 265.  The Court seemed unwilling to say that illegal aliens, who reside here voluntarily and who accept some social obligations, id. at 273, have *no* rights the government is bound to respect when, say, they protest a raid or detention.  Instead, Verdugo-Urquidez teaches that "People" is a word of broader content than "citizens," and of narrower content than "persons."  Compare id. at 269 ("If such is true of the Fifth Amendment, which speaks in the relatively universal term of 'person,' it would seem even more true with respect to the Fourth Amendment, which applies only to 'the people'") with id. at 271 ("[A]liens receive constitutional protections when they have come within the territory of the United

- 7 -

States"—like "persons"—*and* "develop[] substantial connections with this country").

Does Heller shed any light?  Neither majority nor dissents mentioned "aliens," "immigrants," or "non-citizens."  The Court did say that "nothing in our opinion" was meant to undermine the "longstanding prohibitions on the possession of firearms by felons and the mentally ill," two other categories enumerated in § 922(g), given there as "examples."  554 U.S. 626-27 & n.26. Heller also observed that "in all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all members of the political community," id. at 580, which echoes Verdugo-Urquidez's definition but substitutes "political" for "national."

And although the Court did not face the question before us, it is not exactly reading between the lines to note how frequently the opinion connected arms-bearing and citizenship.  A sampling: "we do not read the Second Amendment to protect the right of citizens to carry arms for *any sort* of confrontation, just as we do not read the First Amendment to protect the right of citizens to speak for *any purpose*," id. at 595; "whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home," id. at 635.  We learn that the right was described in connection with the word "citizen" by founding-era consensus (id. at 576-77, 599); admired commentators like St.

George Tucker (id. at 594-95), James Madison (id. at 595), and John Norton Pomeroy (id. at 618); the Freedmen's Bureau Act of 1866 and Civil Rights Act of 1871 (id. at 615-16); state-court decisions between 1829-1871 (id. at 608, 612-14); on through the crucial precedent of United States v. Miller, 307 U.S. 174 (1939) (id. at 625).

Yet despite this we hesitate to infer from Heller a rule that the right to bear arms is categorically inapplicable to non-citizens. We realize that many district courts have discerned such a rule, see, e.g., United States v. Guerrero-Leco, 2008 WL 4534226 at *1 (W.D.N.C. Oct. 6, 2008) (right belongs to citizens only). The Fifth and Eighth circuits, by contrast, limited their holding to *illegal* aliens. See also United States v. Yanez-Vasquez, 2010 WL 411112, at * 2 (D.Kan. Jan. 28, 2010). But we refrain because the question in Heller was the amendment's *raison d'être*—does it protect an individual or collective right?—and aliens were not part of the calculus. Nor can we say that the word "citizen" was used deliberately to settle the question, not least because doing so would conflict with Verdugo-Urquidez, a case Heller relied on. It would require us to hold that the same "people" who receive Fourth Amendment protections are denied Second Amendment protections, even though both rights seem at root concerned with guarding the sanctity of the home against invasion. Besides, Heller also spoke of the First Amendment rights of "citizens," though we know that that amendment extends in some degree to resident aliens, too. Bridges v. Wixon, 326 U.S. 135,

- 9 -

147-48 (1945).

Perhaps an even greater reason not to read an unwritten holding into Heller is that the question seems large and complicated. "[S]ince this case represents [our] first in-depth examination of the Second Amendment," the Court explained, "one should not expect it to clarify the entire field." Heller, 554 U.S. at 635. The Justices (on both sides of the question) drew upon the understanding of the age of 1787 in determining the right's scope. We must follow that approach, yet this textual-historical inquiry is unaddressed in the parties' briefs, nor is there anything to this end in the record. We know, for instance, that the founders' notion of citizenship was less rigid than ours, largely tied to the franchise, which itself was often based on little more than a period of residence and being a male with some capital. 2 Collected Works of James Wilson 839-43 (K. Hall & M. Hall eds. 2007). How, historically, *has* this country regulated weapon possession by foreigners? Are we to understand gun ownership as among the private rights not generally denied aliens, like printing newspapers or tending a farm, or one of the rights tied to self-government, like voting and jury service, largely limited to citizens? Is there a distinction between a "national" community (Verdugo-Urquidez) and a "political" one (Heller)? Is it significant that McDonald v. City of Chicago, 130 S.Ct. 3020, 3042 (2010), declared the right "fundamental"?

That Congress saw fit to exclude illegal aliens from carrying guns may indicate its belief, entitled to our respect, that such aliens, as a class, possess no

- 10 -

such constitutional right. We think we can avoid the constitutional question by *assuming*, for purposes of this case, that the Second Amendment, as a "right of the people," could very well include, in the absence of a statute restricting such a right, at least some aliens unlawfully here—and still easily find § 922(g)(5) constitutional. The apparent inconsistency in assuming the existence of a right before sustaining a law that acts as a blanket prohibition on it is, we believe, outweighed by the prudence of abstaining on a question of such far-reaching dimensions without a full record and adversarial argument. If the right didn't apply at all, the case would be at an end. If the right *does* apply, even if in less robust dimensions than it does for citizens, the question is the level of scrutiny.

We applied "intermediate" scrutiny in <u>Reese</u>, 627 F.3d at 802, which involved a Second Amendment challenge by a *citizen* to 18 U.S.C. § 922(g)(8), the provision forbidding firearms to those subject to a domestic-protection order. If we assume that an illegal alien like Mr. Huitron-Guizar, who has been here for decades and nowhere else, is entitled to the lawful exercise of this enumerated right, and if we observe that the law here not only burdens but eliminates the right by placing, on a class of perhaps millions, a total prohibition upon possessing any type of gun for any reason, "intermediate" scrutiny would seem to apply. <u>Id.</u>, at 800 (comparing burdens imposed by the various § 922 restrictions). Under this standard a law is sustained if the government shows that it is "substantially related" to an "important" official end. <u>Id</u>. at 802.

- 11 -

The "principal purposes" of the Gun Control Act of 1968 are to "make it possible to keep firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency, and to assist law enforcement authorities in the States and their subdivisions in combating the increasing prevalence of crime." S.Rep. No. 90-1501, at 22 (1968). The alien-in-possession ban was incorporated from a predecessor statute by the 1986 Firearm Owners' Protection Act, Pub.L. No. 99-308, 100 Stat. 449, likewise with purpose of keeping instruments of deadly force away from those deemed irresponsible or dangerous. S.Rep. No. 98-583, at 12 (1986).

Congress may have concluded that illegal aliens, already in probable present violation of the law, simply do not receive the full panoply of constitutional rights enjoyed by law-abiding citizens. Or that such individuals, largely outside the formal system of registration, employment, and identification, are harder to trace and more likely to assume a false identity. Or Congress may have concluded that those who show a willingness to defy our law are candidates for further misfeasance or at least a group that ought not be armed when authorities seek them. It is surely a generalization to suggest, as courts do, see, e.g., United States v. Orellana, 405 F.3d 360, 368 (5th Cir. 2005), that unlawfully present aliens, as a group, pose a greater threat to public safety—but general laws deal in generalities. The class of convicted felons, too, includes non-violent offenders. See McCane, 573 F.3d at 1048-49 (10th Cir. 2009) (Tymkovich, J.,

concurring) (suggesting that <u>Heller</u>'s "dictum" should not foreclose challenges to the felon-dispossession law in § 922(g)(1)). The law applies with equal force to those who entered yesterday and those who, like Mr. Huitron-Guizar, were carried across the border as a toddler. The bottom line is that crime control and public safety are indisputably "important" interests.

Nothing is this opinion purports to express an opinion on the Second Amendment rights of *lawfully present* aliens, yet we note that, since 1998, under this same statute, even those admitted on non-immigrant visas (usually issued to visitors for business or pleasure) are prohibited from having firearms and ammunition unless they secure a special waiver or happen to be hunters or diplomatic or law-enforcement officials here on business. 18 U.S.C. § 922(y)(2).

The thrust of <u>Heller</u>, or at least the intended thrust of much post-<u>Heller</u> litigation, has been to broaden the right. Recently some state statutes that burden gun possession by lawful permanent aliens (which § 922(g)(5) does not cover) have been declared invalid under the Equal Protection Clause, which requires that strict scrutiny be applied to state laws that impose restrictions based on alienage. <u>See, e.g.</u>, <u>People v. Bounasri</u>, 915 N.Y.S.2d 921, 924 (N.Y. City Ct. 2011) (invalidating New York statute dating from 1905, prohibiting non-citizens from possessing a dangerous weapon, and noting related decisions in Michigan, Nevada, California); <u>Fletcher v. Haas</u>, — F.Supp. 2d —, 2012 WL 1071713, at *14 (D. Mass. Mar. 30, 2012) (holding that Massachusetts's firearm regime

contravenes the Second Amendment as applied to lawful permanent residents).

If the right's "central component," as interpreted by Heller, 554 U.S. at 599, is to secure an individual's ability to defend his home, business, or family (which often includes children who are American citizens), why exactly should all aliens who are not lawfully resident be left to the mercies of burglars and assailants? That must be at least one reason behind the wave of challenges to § 922(g)(5). But courts must defer to Congress as it lawfully exercises its constitutional power to distinguish between citizens and non-citizens, or between lawful and unlawful aliens, and to ensure safety and order. On this record, § 922(g)(5) withstands Mr. Huitron-Guizar's Second Amendment and Equal Protection challenges.

B.      Sentencing Error

Mr. Huitron-Guizar was sentenced under U.S.S.G. § 2K2.1(a)(4)(B), see 3 R. 78, not, as he asserts, § 2K.1(a)(6), Aplt. Br. at 22. The former, which covers offenses involving a "semiautomatic firearm that is capable of accepting a large capacity magazine," has a higher base offense level. Mr. Huitron-Guizar argues that the "lawful sporting purposes" exception, U.S.S.G. § 2K2.1(b)(2), should apply, since he claims sport shooting was his interest in the guns. The trial court disagreed. 3 R. 78. Regardless, that exception does not, by its terms, apply to offenses under (a)(4). U.S.S.G. § 2K2.1 cmt. n.6. Nor do we find that the court abused its discretion in refusing to vary downwards based on age under § 5H1.1.

- 14 -

The court found no unusual circumstances to justify a variance, though aware of its legal authority to do so. United States v. Fonseca, 473 F.3d 1109, 1112 (10th Cir. 2007). Finally, the argument that a departure or variance was in order based on governmental conduct is meritless. The attempt to connect, in a vague, free-wheeling way, the gun possession at issue here with the Fast and Furious Operation of the Bureau of Alcohol, Tobacco, Firearms and Explosives is not persuasive. The court nonetheless considered Mr. Huitron-Guizar's history and characteristics and saw fit to grant a variance, under 18 U.S.C. § 3553(a)(1), that reduced the sentence by 12 months. 3 R. 80. The court did not abuse its discretion.

AFFIRMED.