LUCERO, Circuit Judge,
concurring separately.
Even were concealed carry protected under the Second Amendment or the Privileges and Immunities Clause, I would yet affirm. I separately add this coda to advance an alternative basis for affirmance. Assuming that concealed carry were to be protected under the stated clauses, I nonetheless would remain in substantial agreement, on an alternative basis, with the analytical framework adopted by the district court.
I would apply intermediate scrutiny to both claims to the extent concealed carry is protected, and would hold that the state has carried its burden under that standard. As part of its general public safety interest, Colorado has shown that ensuring CHL holders are qualified under state law is an important governmental objective. The state also proffered unrefuted evidence demonstrating that much of the information necessary to determine whether an individual is qualified for a CHL is kept in locally maintained databases, and that Colorado sheriffs do not have access to such information with respect to non-resident applicants. ■ In light of law enforcement officials’ averments that they would be effectively unable to determine whether a non-resident applicant is qualified to ob *1217 tain a CHL, I conclude that the residency requirement is substantially related to the stated governmental objective.
I
A
In describing the two-step analysis applicable to Second Amendment claims in Reese, we cited favorably to United States v. Marzzarella, 614 F.3d 85 (3d Cir.2010), in which the Third Circuit concluded that “ ‘the Second Amendment can trigger more than one particular standard of scrutiny,’ depending, at least in part, upon ‘the type of law challenged and the type of Second Amendment restriction at issue.’ ” Reese, 627 F.3d at 801 (quoting Marzzarella, 614 F.3d at 96-97) (alterations omitted). The Marzzarella court applied intermediate scrutiny in weighing the constitutionality of 18 U.S.C. § 922(k), a statute that prohibits the possession of a firearm with an obliterated serial number, because “ ‘the burden imposed by the law did not severely limit the possession of firearms,’ as did ‘the District of Columbia’s handgun ban’ that was at issue in Heller.” Reese, 627 F.3d at 801 (quoting Marzzarella, 614 F.3d at 97) (alterations omitted). We also cited United States v. Skoien, 614 F.3d 638 (7th Cir.2010) (en banc), with approval. In that case, the Seventh Circuit, “citing cases involving analogous constitutional rights, concluded that [18 U.S.C.] § 922(g)(9) [which prohibits any person who has been convicted in any court of a misdemeanor crime of domestic violence from possessing firearms] was subject to intermediate scrutiny.” Reese, 627 F.3d at 802 (citing Skoien, 614 F.3d at 641).
Consistent with Marzzarella and Skoien, the Reese court held that 18 U.S.C. § 922(g)(8), which prohibits an individual who is subject to a domestic protection order from possessing firearms, was subject to intermediate scrutiny. 627 F.3d at 802. We explained:
To be sure, § 922(g)(8) is arguably more restrictive than § 922(k), the statute at issue in Marzzarella, in that it prohibits the possession of all types of firearms. On the other hand, however, § 922(g)(8) is less restrictive than § 922(k) in that it applies only to a narrow class of persons, rather than to the public at large. And, in that regard, § 922(g)(8) is substantially similar to § 922(g)(9), the statute at issue in Skoien. Specifically, both statutes prohibit the possession of firearms by narrow classes of persons who, based on their past behavior, are more likely to engage in domestic violence.
Reese, 627 F.3d at 802. “Based upon these characteristics,” we held that § 922(g)(8) survived if the government could demonstrate “that its objective is an important one and that its objective is advanced by means substantially related to that objective.” Reese, 627 F.3d at 802 (quotation omitted).
We followed a similar path in United States v. Huitron-Guizar, 678 F.3d 1164 (10th Cir.2012), noting that “[t]he right to bear arms, however venerable, is qualified by what one might call the ‘who,’ ‘what,’ ‘where,’ ‘when,’ and ‘why.’” Id. at 1166. We provided numerous examples of valid restrictions on the right to bear arms: “For instance, it is unlawful to knowingly receive guns with obliterated serial numbers. A juvenile, with some exceptions, cannot possess a handgun. An airline passenger may not carry aboard a concealed firearm. Nor may a drug dealer use or carry a weapon to protect his stash.” Id. (citations omitted). With respect to the statute challenged in Huitron-Guizar, we assumed that the Second Amendment applies to illegal aliens, and “observing] that the law here not only burdens but eliminates the right by placing, on a class of perhaps millions, a total prohibition upon possessing any type of gun for any reason,” concluded that “intermediate scruti *1218 ny would seem to apply.” Id. at 1169 (citing Reese, 627 F.3d at 800).
Several other circuits have adopted this two-step, sliding-scale approach with respect to Second Amendment scrutiny since Heller was decided. In Ezell v. City of Chicago, 651 F.3d 684 (7th Cir.2011), the Seventh Circuit adopted an inquiry similar to that enunciated in Reese, 627 F.3d at 800-01. “First, the threshold inquiry in some Second Amendment cases will be a ‘scope’ question: Is the restricted activity protected by the Second Amendment in the first place?” Ezell, 651 F.3d at 701. If the Second Amendment is implicated, “the rigor of this judicial review will depend on how close the law comes to the core of the Second Amendment right and the severity of the law’s burden on the right.” Id. at 703. Similarly, in United States v. Chester, 628 F.3d 673 (4th Cir. 2010), the Fourth Circuit applied a two-step inquiry, asking first “whether the conduct at issue was understood to be within the scope of the right at the time of ratification.” Id. at 680. If the conduct is protected, the court must select the proper level of scrutiny depending upon the type of law being challenged. Id. In National Rifle Association of America, Inc., the Fifth Circuit analogized to First Amendment cases, holding that
the first step is to determine whether the challenged law ... regulates conduct that falls within the scope of the Second Amendment’s guarantee; the second step is to determine whether to apply intermediate or strict scrutiny to the law, and then to determine whether the law survives the proper level of scrutiny.
700 F.3d at 194. And following remand in the Heller case, the D.C. Circuit has taken the same approach: “We ask first whether a particular provision impinges upon a right protected by the Second Amendment; if it does, then we go on to determine whether the provision passes muster under the appropriate level of constitutional scrutiny.” Heller v. District of Columbia, 670 F.3d 1244, 1252 (D.C.Cir.2011).[1]
B
At the second stage of this two-part analysis, several courts have considered whether the regulation at issue impacts the “core” of the Second Amendment right which is often described as that of “law-abiding, responsible citizens to use arms in defense of hearth and home.” Reese, 627 F.3d at 800 (quotation omitted); see also Nat’l Rifle Ass’n, 700 F.3d at 195 (noting that the “right at the core of the Second Amendment” is “the right of a law-abiding, responsible adult to possess and use a handgun to defend his or her home and family”); GeorgiaCarry.Org, Inc. v. Georgia, 687 F.3d 1244, 1259 (11th Cir.2012) (pointing out that Heller focused on “the core lawful purpose of self-defense” and “went to great lengths to emphasize the special place that the home — an individual’s private property — occupies in our society” (quotations omitted)); United States v. Greeno, 679 F.3d 510, 517 (6th Cir.2012) (“The core right recognized in Heller is the right of law-abiding, responsible citizens to *1219 use arms in defense of hearth and home.” (quotation omitted)); Heller, 670 F.3d at 1255 (holding that “the core lawful purpose protected by the Second Amendment” is that of “a person lawfully to acquire and keep a firearm, including a handgun, for the purpose of self-defense in the home” (quotation omitted)); Ezell, 651 F.3d at 689 (“[T]he [Second] Amendment secures an individual right to keep and bear arms, the core component of which is the right to possess operable firearms — handguns included — for self-defense, most notably in the home.” (citation omitted)); United States v. Barton, 633 F.3d 168, 170 (3d Cir.2011) (“At the core of the Second Amendment is the right of law-abiding, responsible citizens to use arms in defense of hearth and home.” (quotation omitted)); Chester, 628 F.3d at 676 (holding “the core of the Second Amendment” is “the right of law-abiding, responsible citizens to use arms in defense of hearth and home” (quotation omitted)).
Colorado state law does not prohibit the possession of firearms, concealed or otherwise, in an individual’s “own dwelling or place of business or on property owned or under his or her control.” Colo.Rev.Stat. § 18-12-105(2)(a). Peterson submitted affidavits stating that he does not own any home or other private property in Colorado. Nevertheless, the state law he claims is unconstitutional, Colo.Rev.Stat. § 18-12-203(l)(a), does not affect his ability “to use arms in defense of hearth and home,” the core of the right guaranteed by the Second Amendment. Reese, 627 F.3d at 800 (quotation omitted). It restricts only his ability to carry a concealed weapon outside of the home.
In selecting the proper level of scrutiny in Reese, we also considered whether the challenged statute “applies only to a narrow class of persons, rather than to the public at large.” 627 F.3d at 802. Although the residency requirement at issue governs the vast majority of individuals in the United States (all those who do not live in Colorado), it burdens a relatively small proportion of individuals present in the state at any time. As Peterson notes, however, individuals covered by the challenged statute have not demonstrated that they are more likely to engage in violence or are otherwise irresponsible. In contrast, several of the cases holding strict scrutiny inappropriate to a Second Amendment challenge have considered restrictions on non-law abiding individuals. See Chester, 628 F.3d at 683 (applying intermediate scrutiny in challenge to 18 U.S.C. § 922(g)(9), which prohibits domestic violence misdemeanants from possessing firearms); Skoien, 614 F.3d at 64CM1 (same); see also Heller, 554 U.S. at 626-27, 128 S.Ct. 2783 (noting that the Court’s decision should not cast doubt on prohibition of “possession of firearms by felons and the mentally ill”).
Nonetheless, I would reject Peterson’s argument that every Second Amendment case involving “law-abiding citizens” requires strict scrutiny. To the extent that strict scrutiny may be an appropriate standard of review in the Second Amendment context, Peterson’s position is inconsistent with our statement in Huitron-Guizar, that “[t]he right to bear arms, however venerable, is qualified by what one might call the ‘who,’ ‘what,’ ‘where,’ ‘when,’ and “why.’ ” 678 F.3d at 1166. And in Reese we applied intermediate scrutiny to a challenge of § 922(g)(8), which applies to individuals subject to a domestic protection order but does not require a showing that the subject of the order has committed a crime. See Reese, 627 F.3d at 802; see also Marzzarella, 614 F.3d at 97 (reviewing § 922(k), which prohibits the possession of a firearm with an obliterated serial number, under intermediate scrutiny). Nor does Peterson’s contention square with Helleds presumptive approval of *1220 “laws forbidding the carrying of firearms in sensitive places such as schools and government buildings.” 554 U.S. at 626, 128 S.Ct. 2783. Although the class of individual burdened is one consideration at step two of the Second Amendment analysis, it is not the only one.
Cognizant of these relevant factors and the statement in Heller that “the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues,” 554 U.S. at 626, 128 S.Ct. 2783, Peterson’s challenge triggers, at most, intermediate scrutiny. See Reese, 627 F.3d at 801 (noting that the level of scrutiny depends “at least in part, upon the type of law challenged and the type of Second Amendment restriction at issue” (quotation and alterations omitted)).
This conclusion is consistent with the few courts that have considered Second Amendment challenges to concealed carry 'restrictions. Rejecting a challenge to New York’s handgun licensing scheme, the Second Circuit held that “applying less than strict scrutiny when the regulation does not burden the ‘core’ protection of self-defense in the home makes eminent sense in this context and is in line with the approach taken by our sister circuits.” Kachalsky, 701 F.3d at 93. And in Hightower v. City of Boston, 693 F.3d 61 (1st Cir.2012), the First Circuit held that “laws prohibiting the carrying of concealed weapons are an example of longstanding restrictions that are presumptively lawful under the Second Amendment.” Id. at 73 (quotations and alterations omitted). This holding is plainly incompatible with strict or near-strict scrutiny. Other courts have similarly applied intermediate scrutiny to firearm restrictions that do not implicate the core Second Amendment right. See Heller, 670 F.3d at 1257-58 (concluding that several “novel” registration requirements were subject to intermediate scrutiny because they did not prohibit “an individual from possessing a firearm in his home or elsewhere, whether for self-defense or hunting, or any other lawful purpose”); Chester, 628 F.3d at 683 (applying intermediate scrutiny to a challenge to § 922(g)(9)’s prohibition of gun possession by domestic violence misdemeanants because the regulated conduct “is not within the core right identified in Heller — the right of a law-abiding, responsible citizen to possess and carry a weapon for self-defense” (emphasis omitted)).
C
To survive intermediate scrutiny, the government bears the burden of showing “that its objective is an important one and that its objective is advanced by means substantially related to that objective.” Reese, 627 F.3d at 802 (quotation omitted). I agree with the district court that Colorado, as part of its interest in ensuring public safety, has an important government interest in assessing whether an individual is qualified to possess a CHL, and in monitoring whether CHL holders maintain their qualifications. I also agree with the district court that the residency requirement is substantially related to that objective in light of the record evidence indicating that less information is available with respect to non-resident CHL applicants and that Colorado officials cannot adequately monitor non-residents.
Colorado law permits a sheriff to refuse a CHL if “the sheriff has a reasonable belief that documented previous behavior by the applicant makes it likely the applicant will present a danger to self or others if the applicant receives a permit to carry a concealed handgun.” Colo.Rev.Stat. § 18-12-203(2). This limitation, which Peterson does not expressly attack, closely *1221 parallels the objective we approved in Reese, which was to
keep firearms out of the hands of people who have been judicially determined to pose a credible threat to the physical safety of a family member, or who have been ordered not to use, attempt to use, or threaten to use physical force against an intimate partner or child that would reasonably be expected to cause bodily injury, because such persons undeniably pose a heightened danger of misusing firearms.
627 F.3d at 802 (quotations and alteration omitted). At one level, then, the objective at issue in this case has already been declared an “important one” by this court. Id.
However, the statute Peterson challenges is not Colo.Rev.Stat. § 18-12-203(2), but Colo.Rev.Stat. § 18-12-203(l)(a), which requires that a CHL applicant be a resident of Colorado. The objectives behind the challenged law are to ensure that an applicant is qualified to obtain a CHL, and to monitor continued qualification after a CHL is issued. Although these objectives are one step removed from the direct public safety interest underlying § 18-12-203(2), I would hold that Colorado has a substantial interest in ensuring that CHL holders are qualified under state law. Given that the statutory scheme rests on an important governmental objective, I have no trouble concluding the state has a substantial interest in ensuring compliance with the statute.
I further conclude that the residency requirement is “substantially related” to the stated objectives. Reese, 627 F.3d at 802 (quotation omitted). Two law enforcement officials submitted affidavits explaining that “information in locally-maintained databases is absolutely critical to assessing a [CHL] applicant’s qualifications” and stating that “lack of access to” information kept in locally maintained databases “would make it more or less impossible to effectively conduct this type of screening for non-resident [CHL] applicants.” The affiants explained that several categories of information are not available with respect to non-resident applicants, including records of municipal crime convictions, mental health and other emergency contacts, juvenile arrest records, some plea agreements, restraining orders entered in civil cases, and determinations that an individual is a danger to himself. One of the affiants, Spoden, also averred that a state database provides a system to “ensure the ongoing eligibility of’ resident CHL holders by “flagging]” events of concern that occur in state, but does not provide “the ability to monitor [non-residents’] law enforcement contacts in their actual state of residence.” Both officials opined that they would not be able to ensure statutory eligibility of non-resident CHL applicants.
Thus the unrefuted record evidence demonstrates that Colorado law enforcement officials have access to a greater level of information with respect to resident CHL applicants than non-residents. The record further establishes that the data limitations for non-resident applicants would make it “more or less impossible” to ensure statutory qualification. And Spoden’s affidavit shows that this data differential continues even after a CHL is issued. A state flagging system alerts sheriffs when a Coloradoan comes into contact with law enforcement in her state of residence; this is not so for residents of other states. I would hold that this evidence establishes the requisite substantial relationship between the challenged statute and the objective of ensuring CHLs are held only by qualified individuals.
Peterson complains that the affidavits do not provide any reason to deny him a CHL *1222 in particular. But this complaint misunderstands the intermediate scrutiny tailoring requirement. The challenged statute must be substantially related to advancement of an important governmental objective, but it need not provide a perfect fit. See Michael M. v. Superior Court, 450 U.S. 464, 473, 101 S.Ct. 1200, 67 L.Ed.2d 437 (1981) (plurality opinion) (in conducting intermediate scrutiny analysis, “[t]he relevant inquiry ... is not whether the statute is drawn as precisely as it might have been, but whether the line chosen by the ... Legislature is within constitutional limitations”). For example, in reviewing a minority preference program for certain broadcasting licenses under the intermediate scrutiny standard applicable at the time, the Court explained:
Congressional policy does not assume that in every case minority ownership and management will lead to more minority-oriented programming or to the expression of a discrete “minority viewpoint” on the airwaves. Neither does it pretend that all programming that appeals to minority audiences can be labeled “minority programming” or that programming that might be described as “minority” does not appeal to nonminorities. Rather, both Congress and the FCC maintain simply that expanded minority ownership of broadcast outlets will, in the aggregate, result in greater broadcast diversity.
Metro Broad. Inc. v. FCC, 497 U.S. 547, 579, 582-583, 110 S.Ct. 2997, 111 L.Ed.2d 445, (1990), overruled on other grounds, Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 227, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). Similarly, in Rostker v. Goldberg, 453 U.S. 57, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981), the Court approved of the male-only selective service registration requirement notwithstanding the fact that “a small number of women could be drafted for noncombat roles.” Id. at 81, 101 S.Ct. 2646. On the record before us, it is clear that non-residency is substantially related to the objective of ensuring CHL holders are qualified under state law because insufficient information is available as to non-residents in the aggregate. This is so even if we accept Peterson’s unsupported assertion that this information gap may not be present in every case.
Equally unavailing is Peterson’s contention that the residency requirement is insufficiently related to the stated interest because it fails to distinguish between newly arrived Colorado residents and nonresidents. Although information on past activities may be unavailable with respect to new residents in the state, the ongoing-monitoring rationale applies equally to any Colorado resident regardless of how long he has lived in the state.
In considering a similar challenge to a residency requirement, the Second Circuit reached the same conclusion in a pre-Hel-ler case. In Bach v. Pataki, the court rejected a Privileges and Immunities Clause challenge to New York’s residency requirement for handgun licensure. The court required New York to demonstrate: “(a) a substantial reason for the discrimination, and (b) a reasonable relationship between the degree of discrimination exacted and the danger sought to be averted,” 408 F.3d at 88, a standard quite similar to intermediate scrutiny. As in this case, the court agreed that “the State has a substantial and legitimate interest in insuring the safety of the general public from individuals who, by their conduct, have shown themselves to be lacking the essential temperament or character which should be present in one entrusted with a dangerous instrument.” Id. at 91 (quotation and ellipses omitted). The court further concluded that New York’s interest “extends to the State’s ability to monitor licensees’ good character, competency and integrity, including their mental fitness, *1223 composure, maturity of judgment, and safe or unsafe habits.” Id. at 91 n. 31 (quotations and citations omitted).
As to the fit between the residency requirement and the state’s interest, the court accepted New York’s explanation that “[t]he ongoing flow of information to a licensing officer as a result of the licensee’s tie to a particular residence or community is an important element of the State’s regulatory scheme.” Id. at 92. For in-state residents, the court noted, there is a substantially higher “likelihood that a licensing officer will be alerted to facts that cast doubt on a licensee’s fitness to possess a firearm.” Id. I agree that this rationale supplies the requisite fit between a residency requirement and the state’s important interest of ensuring that CHL holders are qualified.
In Peruta v. Cnty. of San Diego, 758 F.Supp.2d 1106 (S.D.Cal.2010), the court adopted Bach’s analysis in a post-Heller challenge. Id. at 1120. Assuming that restrictions that prevented “non-residents from applying for a permit to carry á concealed weapon” implicated the Privileges and Immunities Clause, the court agreed with the Bach court’s conclusion that the state had a “substantial interest in monitoring gun licensees and that limiting licenses to residents and those working primarily within the state was sufficiently related to that interest.” Id.
Although the specific restrictions at issue in this case differ in some ways from those at issue in Bach and Peruta, I agree with those courts that a residency requirement for a CHL is substantially related to an important governmental objective, and thus that Colo.Rev.Stat. § 18-12-203(l)(a) survives intermediate scrutiny.
II
I would also affirm the district court even on the assumption that the Privileges and Immunities Clause is implicated in this suit. In discussing the privileges and immunities protected by Article IV, the Saenz Court stated that “[tjhose protections are not absolute, but the Clause does bar discrimination against citizens of other States where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other States.” 526 U.S. at 502, 119 S.Ct. 1518 (citations and quotation omitted). Rather than strict scrutiny, a welcome visitor claim is subject to the following test: “if the challenged restriction deprives nonresidents of a protected privilege, [the court] will invalidate it only if [it] conclude[s] that the restriction is not closely related to the advancement of a substantial state interest.” Friedman, 487 U.S. at 65, 108 S.Ct. 2260; see also Kleinsmith v. Shurtleff 571 F.3d 1033, 1044 (10th Cir.2009) (“[D]enial of a privilege or immunity to nonresidents is invalid unless (i) there is a substantial reason for the difference in treatment; and (ii) the discrimination practiced against nonresidents bears a substantial relationship to the State’s objective.” (quotation omitted)).
This standard is essentially identical to intermediate scrutiny. Intermediate scrutiny is satisfied if the government can show “that its objective is an important one and that its objective is advanced by means substantially related to that objective.” Reese, 627 F.3d at 802. The privileges and immunities tailoring requirement also demands a “substantial relationship to the State’s objective.” Kleinsmith, 571 F.3d at 1044. And although the formulation we adopted in Reese referred to an “important” government objective, 627 F.3d at 802, the terms “important” and “substantial” have been used interchangeably in referring to the intermediate scrutiny ends prong. See, e.g., Golan v. Holder, 609 F.3d 1076, 1084 (10th Cir.2010) (“In order for a statute to survive intermediate scrutiny, the statute must be directed at *1224 an important or substantial governmental interest... .”).
As discussed above, I would hold in the alternative that the residency requirement for obtaining a CHL survives intermediate scrutiny. And because Peterson’s Privileges and Immunities Clause claim is subject to the same form of review, I would also hold that this claim fails even assuming that the carrying of a concealed firearm is a protected privilege. Colorado has shown that ensuring CHL holders are qualified is an important governmental objective, and the residency requirement is substantially related to that objective. The two other courts that have considered right to travel challenges of CHL residency requirements have reached the same conclusion, on largely the same basis. See Bach, 408 F.3d at 87 (“Because we hold that New York’s interest in monitoring gun licensees is substantial and that New York’s restriction of licenses to residents and persons working primarily within the State is sufficiently related to this interest, we reject Bach’s Article IV Privileges and Immunities Clause challenge.”); Peruta, 758 F.Supp.2d at 1120 (“The Court is unable to discern a meaningful distinction between the issues facing the Second Circuit in Bach and those at issue here. Adopting the rationale set forth in that decision, the Court concludes there is no genuine issue of material fact as to whether Defendant’s policy violates the right to travel.”).

. At the first step of this analysis, the D.C. Circuit held that " 'longstanding' regulations are 'presumptively lawful,’ that is, they are presumed not to burden conduct within the scope of the Second Amendment.” Heller, 670 F.3d at 1253 (quoting Heller, 554 U.S. at 626-27 & n. 26, 128 S.Ct. 2783). A plaintiff may rebut the presumption of validity by showing that the regulation at issue has "more than a de minimis effect upon his right.” Id. This de minimis burden exception has also been adopted by the Second Circuit. See United States v. Decastro, 682 F.3d 160, 164 (2d Cir.2012) ("We hold that heightened scrutiny is appropriate only as to those regulations that substantially burden the Second Amendment. Because § 922(a)(3) only minimally affects the ability to acquire a firearm, it is not subject to any form of heightened scrutiny.”).