*639 EASTERBROOK, Chief Judge.
Steven Skoien has two convictions for “misdemeanor crime[s] of domestic violence” and therefore is forbidden to carry firearms in or affecting interstate commerce. 18 U.S.C. § 922(g)(9). Wisconsin informed Skoien about this rule; he signed an acknowledgment of the firearms disability. While he was on probation from the second of his domestic-violence convictions, he was found in possession of three firearms: a pistol, a rifle, and a shotgun. He pleaded guilty to violating § 922(g)(9) by possessing the shotgun and was sentenced to two years’ imprisonment. His conditional guilty plea, see Fed.R.Crim.P. 11(a)(2), reserves the right to contend that § 922(g)(9) violates the Constitution’s Second Amendment. We heard this appeal en banc to decide whether § 922(g)(9) comports with that amendment, as interpreted in District of Columbia v. Heller, — U.S. -, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). The eleventh circuit has held that it does. United States v. White, 593 F.3d 1199, 1205-06 (11th Cir.2010). The fourth circuit has implied otherwise, though in a non-precedential order. United States v. Chester, 367 Fed.Appx. 392 (4th Cir.2010).
Heller concludes that the Second Amendment “protects the right to keep and bear arms for the purpose of self-defense” and that a law “that banned the possession of handguns in the home” violates that right. McDonald v. Chicago, -U.S.-, 130 S.Ct. 3020, 3021, 177 L.Ed.2d 894 (2010). The United States submits that, before considering how the amendment applies to shotguns and hunting (which is how Skoien contends he used that weapon), we must decide whether Congress is entitled to adopt categorical disqualifications such as § 922(g)(9). The prosecutor relies on this passage from Heller:
Like most rights, the right secured by the Second Amendment is not unlimited.... Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.[26]
128 S.Ct. at 2816-17, reiterated by McDonald, at 3063 (plurality opinion). To this Skoien replies that his prior offenses were misdemeanors rather than felonies, 'and that § 922(g)(9) is not a “longstanding” prohibition, having been enacted in 1996. See United States v. Hayes, — U.S.-, 129 S.Ct. 1079, 172 L.Ed.2d 816 (2009) (discussing its genesis). The prosecutor rejoins by noting that the Court stated its holding this way:
[W]e hold that the District’s ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense. Assuming that Heller is not disqualified from the exercise of Second Amendment rights, the District must permit him to register his handgun and must issue him a license to carry it in the home.
128 S.Ct. at 2821-22. The reference to being “disqualified” relates to prior convictions and mental illness. Id. at 2819. Heller also observes that the Second Amendment “elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home.” Id. at 2821. People *640 convicted of domestic violence are neither law-abiding nor responsible, the prosecutor contends. ■
We do not think it profitable to parse these passages of Heller as if they contained an answer to the question whether § 922(g)(9) is valid. They are precautionary language. Instead of resolving questions such as the one we must confront, the Justices have told us that the matters have been left open. The language we have quoted warns readers not to treat Heller as containing broader holdings than the Court set out to establish: that the Second Amendment creates individual rights, one of which is keeping operable handguns at home for self-defense. What other entitlements the Second Amendment creates, and what regulations legislatures may establish, were left open. The opinion is not a comprehensive code; it is just an explanation for the Court’s disposition. Judicial opinions must not be confused with statutes, and general expressions must be read in light of the subject under consideration. See Zenith Radio Corp. v. United States, 437 U.S. 443, 462, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978).
Although the passages we have quoted are not dispositive, they are informative. They tell us that statutory prohibitions on the possession of weapons by some persons are proper — -and, importantly for current purposes, that the legislative role did not end in 1791. That some categorical limits are proper is part of the original meaning, leaving to the people’s elected representatives the filling in of details. Heller identified, 128 S.Ct. at 2804, as a “highly influential” “precursor” to the Second Amendment the Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents. (This report is reprinted in Bernard Schwartz, 2 The Bill of Rights: A Documentary History 662, 665 (1971).) The report asserted that citizens have a personal right to bear arms “unless for crimes committed, or real danger of public injury”. Many of the states, whose own constitutions entitled their citizens to be armed, did not extend this right to persons convicted of crime. See Stephen P. Hal-brook, The Founders’ Second Amendment 273 (2008) (concluding that this limitation was understood in the eighteenth century even when not stated expressly in the constitutional text); C. Kevin Marshall, Why Can’t Martha Stewart Have a Gun?, 32 Harv. J.L. & Pub. Policy 695, 700-13 (2009) (surveying the history of state laws limiting convicts’ entitlement to possess firearms). See also United States v. McCane, 573 F.3d 1037, 1047-50 (10th Cir. 2009) (Tymkovich, J., concurring).
The first federal statute disqualifying felons from possessing firearms was not enacted until 1938; it also disqualified misdemeanants who had been convicted of violent offenses. Federal Firearms Act, c. 850, § 2(f), 52 Stat. 1250, 1251. (Technically the crime was “receipt” of a gun that had crossed state lines; the statute treated possession as evidence of receipt.) A 1938 law may be “longstanding” from the perspective of 2008, when Heller was decided, but 1938 is 147 years after the states ratified the Second Amendment. The Federal Firearms Act covered only a few violent offenses; the ban on possession by all felons was not enacted until 1961. Pub.L. 87-342, 75 Stat. 757 (extending the disqualification to all persons convicted of any “crime punishable by imprisonment for a term exceeding one year”, the current federal definition of a “felony”). In 1968 Congress changed the “receipt” element of the 1938 law to “possession,” giving 18 U.S.C. § 922(g)(1) its current form. If such a recent extension of the disqualification to non-violent felons (embezzlers and tax evaders, for example) is presumptively constitutional, as Heller said in note 26, it is difficult to condemn § 922(g)(9), which like the 1938 Act is limited to violent *641 crimes. It would be weird to say that § 922(g)(9) is unconstitutional in 2010 but will become constitutional by 2043, when it will be as “longstanding” as § 922(g)(1) was when the Court decided Heller. Moreover, legal limits on the possession of firearms by the mentally ill also are of 20th Century vintage; § 922(g)(4), which forbids possession by a person “who has been adjudicated as a mental defective or who has been committed to a mental institution”, was not enacted until 1968. Pub.L. 90-618, 82 Stat. 1213, 1220.
So although the Justices have not established that any particular statute is valid, we do take from Heller the message that exclusions need not mirror limits that were on the books in 1791. This is the sort of message that, whether or not technically dictum, a court of appeals must respect, given the Supreme Court’s entitlement to speak through its opinions as well as through its technical holdings. See United States v. Bloom, 149 F.3d 649, 653 (7th Cir.1998). This means that some categorical disqualifications are permissible: Congress is not limited to case-by-case exclusions of persons who have been shown to be untrustworthy with weapons, nor need these limits be established by evidence presented in court. Heller did not suggest that disqualifications would be effective only if the statute’s benefits are first established by admissible evidence.
Categorical limits on the possession of firearms would not be a constitutional anomaly. Think of the First Amendment, which has long had categorical limits: obscenity, defamation, incitement to crime, and others. See United States v. Stevens, -U.S.-,-, 130 S.Ct. 1577, 1584, 176 L.Ed.2d 435 (2010). These categories are not restricted to those recognized in 1791, when the states approved the Bill of Rights. The Justices have held that legislatures may add child pornography to the list, even though the materials do not meet the historical definition of obscenity. New York v. Ferber, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982). More recently, the Court held that speech as part of a public employee’s job is categorically outside the First Amendment. Garcetti v. Ceballos, 547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). There are other categories, which we need not discuss. See generally John Hart Ely, Flag Desecration: A Case Study in the Roles of Categorization and Balancing in First Amendment Analysis, 88 Harv. L.Rev. 1482 (1975). Neither Ferber nor Garcetti conditioned the categorical limit on proof, satisfactory to a court, that the exclusion was vital to the public safety.
We do not mean that a categorical limit on the possession of firearms can be justified under the rational-basis test, which deems a law valid if any justification for it may be imagined. E.g., Vance v. Bradley, 440 U.S. 93, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979). If a rational basis were enough, the Second Amendment would not do anything, see Heller, 128 S.Ct. at 2817-18 n. 27 — because a rational basis is essential for legislation in general. The Court avoided deciding in Stevens how great the public interest must be to adopt a new categorical limit on speech — the United States had argued for treating depictions of extreme animal cruelty the same as child pornography — but stated that the showing must be strong. The United States concedes that some form of strong showing (“intermediate scrutiny,” many opinions say) is essential, and that § 922(g)(9) is valid only if substantially related to an important governmental objective. See Buckley v. American Constitutional Law Foundation, Inc., 525 U.S. 182, 202-04, 119 S.Ct. 636,142 L.Ed.2d 599 (1999) (using this formula for some First Amendment questions); Heckler v. Mathews, 465 U.S. 728, 744-51, 104 S.Ct. 1387, 79 L.Ed.2d 646 (1984) (using this formula *642 for statutes that affect marriage and childbearing). The concession is prudent, and we need not get more deeply into the “levels of scrutiny” quagmire, for no one doubts that the goal of § 922(g)(9), preventing armed mayhem, is an important governmental objective. Both logic and data establish a substantial relation between § 922(g)(9) and this objective.
“Misdemeanor crime of domestic violence” is a defined term.
(A) Except as provided in subparagraph (C), the term “misdemeanor crime of domestic violence” means an offense that—
(i) is a misdemeanor under Federal, State, or Tribal law; and
(ii) has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon, committed by a current or former spouse, parent, or guardian of the victim, by a person with whom the victim shares a child in common, by a person who is cohabiting with or has cohabited with the victim as a spouse, parent, or guardian, or by a person similarly situated to a spouse, parent, or guardian of the victim.
(B) (i) A person shall not be considered to have been convicted of such an offense for purposes of this chapter, unless—
(I) the person was represented by counsel in the case, or knowingly and intelligently waived the right to counsel in the case; and
(II) in the case of a prosecution for an offense described in this paragraph for which a person was entitled to a jury trial in the jurisdiction in which the case was tried, either
(aa) the case was tried by a jury, or
(bb) the person knowingly and intelligently waived the right to have the case tried by a jury, by guilty plea or otherwise.
(ii) A person shall not be considered to have been convicted of such an offense for purposes of this chapter if the conviction has been expunged or set aside, or is an offense for which the person has been pardoned or has had civil rights restored (if the law of the applicable jurisdiction provides for the loss of civil rights under such an offense) unless the pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.
18 U.S.C. § 921(a)(33). A “misdemeanor crime of domestic violence” thus is one in which violence (actual or attempted) is an element of the offense; it is not enough if a risky act happens to cause injury. Cf. Begay v. United States, 553 U.S. 137, 128 S.Ct. 1581, 170 L.Ed.2d 490 (2008); Johnson v. United States, — U.S. -, 130 S.Ct. 1265, 176 L.Ed.2d 1 (2010); United States v. Howell, 531 F.3d 621 (8th Cir. 2008) (applying Begay to § 921(a)(33)).
The belief underpinning § 922(g)(9) is that people who have been convicted of violence once — toward a spouse, child, or domestic partner, no less — are likely to use violence again. That’s the justification for keeping firearms out of their hands, for guns are about five times more deadly than knives, given that an attack with some kind of weapon has occurred. See Franklin E. Zimring, Firearms, Violence, and the Potential Impact of Firearms Control, 32 J.L. Med. & Ethics 34 (2004) (collecting studies).
Hayes, which we mentioned above, held that whether a crime is one of “domestic violence” depends on the identity of the victim rather than the elements of the offense. When describing why § 922(g)(9) was enacted, the Court wrote (129 S.Ct. at 1087):
Existing felon-in-possession laws, Congress recognized, were not keeping fire *643 arms out of the hands of domestic abusers, because “many people who engage in serious spousal or child abuse ultimately are not charged with or convicted of felonies.” 142 Cong. Ree. 22985 (1996) (statement of Sen. Lautenberg). By extending the federal firearm prohibition to persons convicted of “misdemeanor crime[s] of domestic violence,” proponents of § 922(g)(9) sought to “close this dangerous loophole.” Id., at 22986.
Construing § 922(g)(9) to exclude the domestic abuser convicted under a generic use-of-force statute (one that does not designate a domestic relationship as an element of the offense) would frustrate Congress’ manifest purpose. Firearms and domestic strife are a potentially deadly combination nationwide.
There are three propositions in this passage: first that domestic abusers often commit acts that would be charged as felonies if the victim were a stranger, but that are charged as misdemeanors because the victim is a relative (implying that the perpetrators are as dangerous as felons); second that firearms are deadly in domestic strife; and third that persons convicted of domestic violence are likely to offend again, so that keeping the most lethal weapon out of their hands is vital to the safety of their relatives. Data support all three of these propositions.
Start with prosecuting domestic violence as a misdemeanor when similar acts against a stranger would be a felony (a practice often called “undercharging”). Prosecutors face two major obstacles to obtaining felony convictions: some family members are willing to forgive the aggressors in order to restore harmonious relations, while others are so terrified that they doubt the ability of the police to protect their safety. Either way, victims of domestic violence are less willing to cooperate with prosecutors, who may need to reduce charges to obtain even limited cooperation and thus some convictions. See Eve S. Buzawa & Carl G. Buzawa, Domestic Violence: The Criminal Justice Response 177-89 (3d ed.2002). Indeed, either forgiveness or fear induces many victims not to report the attack to begin with. The result is that many aggressors end up with no conviction, or a misdemeanor conviction, when similar violence against a stranger would produce a felony conviction. See, e.g., Report of the Florida Supreme Court Gender Bias Study Commission, reprinted in 42 Fla. L.Rev. 803, 859-60 (1990); Sarah Eaton & Ariella Hyman, The Domestic Violence Component of the New York Task Force Report on Women in the Courts: An Evaluation and Assessment of New York City Courts, 19 Ford-ham Urb. L.J. 391, 461-62 (1992); Patrick A. Langan & Christopher A. Innes, Preventing Domestic Violence Against Women 2 (Bureau of Justice Statistics 1986).
That firearms cause injury or death in domestic situations also has been established. Domestic assaults with firearms are approximately twelve times more likely to end in the victim’s death than are assaults by knives or fists. Linda E. Saltzman, James A. Mercy, Patrick W. O’Carroll, Mark L. Rosenberg & Philip H. Rhodes, Weapon Involvement and Injury Outcomes in Family and Intimate Assaults, 267 J. Am. Medical Ass’n 3043 (1992). Part of this effect stems from the fact that some would-be abusers go buy a gun, see Susan B. Sorenson & Douglas J. Wiebe, Weapons in the Lives of Battered Women, 94 Am. J. Pub. Health 1412 (2004), and much from the fact that guns are more lethal than knives and clubs once an attack begins. See Zimring, Firearms & Violence, supra. The presence of a gun in the home of a convicted domestic abuser is “strongly and independently associated with an increased risk of homicide.” Arthur L. Kellermann, et al., Gun Ownership as a Risk Factor for Homicide in the *644 Home, 329 New England J. Medicine 1084, 1087 (1993). See also, e.g., Jacquelyn C. Campbell, et al., Risk Factors for Femicide in Abusive Relationships: Results from a Midtisite Case Control Study, 93 Am. J. Pub. Health 1089, 1090 (2003); James E. Bailey, et al, Risk Factors for Violent Death of Women in the Home, 157 Archives of Internal Medicine 777 (1997); Douglas J. Wiebe, Homicide and Suicide Risks Associated with Firearms in the Home: A National Case-Control Study, 41 Annals of Emergency Medicine 771 (2003). And for this purpose the victims include police as well as spouses, children, and intimate partners. Responding to a domestic-disturbance call is among an officer’s most risky duties. Approximately 8% of officers’ fatalities from illegal conduct during 1999 through 2008 arose from attempts to control domestic disturbances. FBI, Law Enforcement Officers Killed and Assaulted 2008 Table 19 (2009).
Finally, the recidivism rate is high, implying that there are substantial benefits in keeping the most deadly weapons out of the hands of domestic abusers. For example, a study of persons arrested for misdemeanor domestic violence in Cincinnati concluded that 17% of those who remained in the area were arrested again for domestic violence within three years. John Wooldredge & Amy Thistlethwaite, Reconsidering Domestic Violence Recidivism: Individual and Contextual Effects of Court Dispositions and Stake in Conformity vi (1999). The full recidivism rate includes violence that does not lead to an arrest. Estimates of this rate come from survey research and range from 40% to 80% “when victims are followed longitudinally and interviewed directly.” Carla Smith Stover, Domestic Violence Research, 20 J. Interpersonal Violence 448, 450 (2005). See also Julia C. Babcock, et al., Does Batterers’ Treatment Work? A Meta-Analytic Review of Domestic Violence Treatment, 23 Clinical Psychology Rev. 1023, 1039 (2004) (estimating a 35% recidivism rate based on partners’ reports). Skoien cites, as if it were favorable, a study showing that within three years of conviction 48% of domestic abusers “suspended” their abusive conduct— which means that the other 52% did not, and that even the 48% may have committed new crimes within three years after conviction. John H. Laub & Robert J. Sampson, Understanding Desistance from Crime, 28 Crime & Justice 1, 31 (2001). No matter how you slice these numbers, people convicted of domestic violence remain dangerous to their spouses and partners.
By the time this appeal reached oral argument en banc, Skoien’s principal argument had shifted. Instead of denying the logical and empirical basis of § 922(g)(9), he contended that Congress overreached by creating a “perpetual” disqualification for persons convicted of domestic violence. This goes too far, according to Skoien, because the propensity for violence declines with advancing age, and people who are not convicted of additional offenses have demonstrated that they no longer pose risks to other members of their households. Applying § 922(g)(9) to older persons who have not been in legal trouble for many years cannot be substantially related to an important governmental objective, the argument concludes.
Although the statute provides that ex-pungement, pardon, or restoration of civil rights means that a conviction no longer disqualifies a person from possessing firearms, see 18 U.S.C. § 921(a)(33)(B)(ii), Skoien maintains that, as a practical matter, these routes to restoration are unavailable to domestic-battery misdemeanants in Wisconsin. We have our doubts. As the Supreme Court observed in Logan v. United States, 552 U.S. 23, 128 S.Ct. 475, 169 L.Ed.2d 432 (2007), although Wisconsin *645 does not deprive misdemeanants of the civil rights to vote, serve on a jury, or hold public office — so these rights cannot be “restored” by the passage of time, as felons’ rights often are — the state does give misdemeanants an opportunity to seek pardon or expungement. Some of the largest states make expungement available as of right to misdemeanants who have a clean record for a specified time. California, for example, has such a program. Cal.Penal Code § 1203.4a. See also Robert A. Mikos, Enforcing State Law in Congress’s Shadow, 90 Cornell L.Rev. 1411, 1463-64 & nn. 187, 188 (2005) (finding that expungement increased following the enactment of § 922(g)(9)). This means that § 922(g)(9) in its normal application does not create a perpetual and unjustified disqualification for a person who no longer is apt to attack other members of the household. True, the statute tolerates different outcomes for persons convicted in different states, but this is true of all situations in which a firearms disability (or any other adverse consequence) depends on state law. The Justices held in Logan that this variability does not call into question federal firearms limits based on state convictions that have been left in place under the states’ widely disparate approaches to restoring civil rights.
But let us assume that the effect of § 922(g)(9) should be assessed state by state, rather than for the nation as a whole. The fact remains that Skoien is poorly situated to contend that the statute creates a lifetime ban for someone who does not pose any risk of further offenses. First, Skoien is himself a recidivist, having been convicted twice of domestic battery. The first victim (in 2003) was his wife; after that marriage ended, the second victim (in 2006) was jhis new fiancée. And Skoien was arrested for possessing multiple guns just one year after that second conviction — while he was still on probation.
A person to whom a statute properly applies can’t obtain relief based on arguments that a differently situated person might present. See United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). Although the Salerno principle has been controversial, and the Justices have allowed “over-breadth” arguments when dealing with laws that restrict speech and reach substantially more conduct than the justifications advanced for the statute support, see Stevens, 130 S.Ct. at 1587, the Court has continued to cite Salerno favorably in other situations. See, e.g., Washington State Grange v. Washington State Republican Party, 552 U.S. 442, 449-50, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008); cf. Gonzales v. Carkart, 550 U.S. 124, 167-68, 127 S.Ct. 1610, 167 L.Ed.2d 480 (2007) (observing that “facial” challenges to statutes generally are restricted to litigation under the First Amendment). If convictions may be used to limit where sex offenders can live (and whether they must register), see Connecticut Department of Public Safety v. Doe, 538 U.S. 1, 123 S.Ct. 1160, 155 L.Ed.2d 98 (2003), a disqualification-on-conviction statute such as § 922(g)(9) also is generally proper. Whether a misdemeanant who has been law abiding for an extended period must be allowed to carry guns again, even if he cannot satisfy § 921(a)(33)(B)(ii), is a question not presented today. There will be time enough to consider that subject when it arises.
Affirmed

. We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive.