DISSENT
KAREN NELSON MOORE, Circuit Judge,
dissenting.
I respectfully dissent because I believe that we can resolve the constitutionality of 18 U.S.C. § 922(g)(4) on Heller's, own terms, as we have done for the felon-dispossession provision of § 922(g)(1), and thus there is no need to conduct the two-step inquiry of United States v. Greeno, 679 F.3d 510, 518 (6th Cir. 2012). Moreover, if the two-step inquiry were to apply, I believe that § 922(g)(4) survives intermediate scrutiny. Accordingly, I would uphold § 922(g)(4) as constitutional and affirm the district court without need for remand.
I.
I disagree with the lead opinion’s conclusion that Heller itself does not provide an answer to the constitutionality of § 922(g)(4). As the lead opinion notes, the Supreme Court in District of Columbia v. Heller, 554 U.S. 570, 595, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), recognized that although the Second Amendment bestowed an individual right, this “right was not unlimited, just as the First Amendment’s right of free speech was not.” Specifically, the Court cautioned:
[Nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.
Id. at 626-27, 128 S.Ct. 2783. In an accompanying footnote, the Court noted that it “identified] these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive.” Id. at 627-n. 26,128 S.Ct. 2783.
We have relied on this language in Heller to reject Second Amendment challenges to felon-in-possession convictions under § 922(g)(1) without examining history or applying any level of means-end scrutiny. See United States v. Carey, 602 F.3d 738, 741 (6th Cir. 2010); see also United States v. Khami, 362 Fed.Appx. 501, 507 (6th Cir. 2010) (“[0]ur sister Cir *715 cuits have found that the pronouncement ha Heller ... is sufficient to dispose of the claim that § 922(g)(1) is unconstitutional.”). This is because we have found that Heller's inclusion of felon-dispossession statutes in its list of “longstanding prohibitions” reflects that the Second Amendment “is specifically limited in the case of felon prohibitions.” Carey, 602 F.3d at 741 (citing Heller, 554 U.S. at 626-27, 128 S.Ct. 2783). The same must be true for prohibitions on the possession of firearms by the mentally ill, a “longstanding prohibition! ]” explicitly mentioned in the same passage. Accordingly, we should evaluate Second Amendment challenges to § 922(g)(4) just as we evaluate Second Amendment challenges to § 922(g)(1).
The lead opinion’s reasoning for using a different approach to evaluate challenges to § 922(g)(4), as opposed to § 922(g)(1), is not persuasive. First, resolving this case under Heller’s own terms would not require taking “an analytical off-ramp to avoid constitutional analysis.” Lead Op. at 10. The lead opinion cites cases criticizing an approach that “treat[s] Heller’s listing of ‘presumptively lawful regulatory measures! ]’ ... as a kind of ‘safe harbor.’ ” United States v. Chester, 628 F.3d 673, 679 (4th Cir. 2010); see Lead Op. at 686 n.6. But the “safe harbor” analysis that the Fourth Circuit was criticizing in Chester is an approach that some courts have used to evaluate laws that are “unlisted” in Heller’s “presumptively lawful” passage, such as § 922(g)(9)’s dispossession of domestic-violence misdemeanants. Id. at 679 (emphasis added). Under this approach, courts rely on Heller to uphold these laws — without conducting an inquiry into means-end scrutiny — if “they deem [an unlisted law] to be analogous to those measures specifically listed in Heller.” Id. (emphasis added); see, e.g., United States v. White, 593 F.3d 1199, 1206 (11th Cir. 2010) (“We see no reason to exclude § 922(g)(9) from the list of longstanding prohibitions on which Heller does not cast doubt.”). In assessing the constitutionality of § 922(g)(4), by contrast, no analogy is needed. “[Pjrohibition[ ] on the possession of firearms by ... the mentally ill,” Heller, 554 U.S. at 626, 128 S.Ct. 2783, is “specifically listed in Heller.” Chester, 628 F.3d at 679. Indeed, it is listed directly beside another “permissible” prohibition — possession by felons. See Heller, 554 U.S. at 626, 635, 128 S.Ct. 2783. Accordingly, relying explicitly on Heller’s “presumptively lawful” language to resolve Second Amendment challenges to § 922(g)(4), as we do with challenges to § 922(g)(1), would be a direct application of the Supreme Court’s language regarding the scope of Heller and the meaning of the Second Amendment.
Second, the lead opinion reasons that we cannot rely on Heller conclusively “given § 922(g)(4)’s lack of historical pedigree.” Lead Op. at 11. But again, the lead opinion fails to offer a persuasive reason for why this demands treating challenges to § 922(g)(4) differently than challenges to § 922(g)(1). The lead opinion quotes the Seventh Circuit in noting that “legal limits on the possession of firearms by the mentally ill ... are of 20th Century vintage.” Id. (alteration in original) (quoting United States v. Skoien, 614 F.3d 638, 641 (7th Cir. 2010)). The lead opinion’s ellipsis omits a single significant word: “also.” See Skoien, 614 F.3d at 641 (emphasis added). This “also” refers to felon-dispossession statutes, which Skoien discussed in the same paragraph. See id. The Seventh Circuit in Skoien recognized that “[t]he first federal statute disqualifying felons from possessing firearms was not enacted until 1938[,] ... 147 years after 'the states ratified the Second Amendment.” Id. at 640. “[T]he ban on possession by all felons” — as opposed to only violent felons — “was not enacted until 1961.” Id. (citing Pub. L. No. *716 87-342, 75 Stat, 757); see also Chester, 628 F.3d at 679 (“Federal felon dispossession laws, for example, were not on the books until the twentieth century, and the historical evidence and scholarly writing on whether felons were protected by the Second Amendment at the time of its ratification is inconclusive.”).[1] Section 922(g)(4) was enacted in 1968, seven years later. Skoien, 614 F.3d at 641 (citing Pub. L. No. 90-618, 82 Stat. 1213,1220). If the relevant historical marker is the ratification of the Second Amendment, a seven-year (or even thirty-year) delay between enactment of § 922(g)(1) and,§ 922(g)(4) hardly justifies differential treatment on the basis of “historical pedigree.”
Third, the lead opinion suggests that we may not rely exclusively on Heller’s discussion of bans on “the mentally ill” because § 922(g)(4) “does not use the phrase ‘mentally ill,’ nor does it attempt to prohibit all currently mentally ill persons from firearm possession.” Lead Op. at 687. This does not support disregarding Heller’s language. In recognizing “longstanding prohibitions on the possession of firearms by ... the mentally ill,” 554 U.S. at 626, 128 S.Ct. 2783, the Heller Court was almost certainly referring to § 922(g)(4). There are a number of firearm-related restrictions in federal law, but only one— § 922(g)(4) — could plausibly be interpreted as seeking to restrict the rights of the “mentally ill,” however defined. Although § 922(g)(4) does not explicitly use the phrase “mentally ill,” the statute — reasonably read — sets out two ways in which individuals can fall into one classification: that of being “mentally ill” for the purposes of firearm dispossession. In selecting involuntary commitment and incompetency as the metrics for dispossession, Congress chose to “piggyback on determinations made in prior judicial proceedings to establish status” for the purposes of the statute, rather than relying on a “free floating” definition of current mental illness. United States v. Rehlander, 666 F.3d 45, 50 (1st Cir. 2012) (emphasis omitted). When the Heller Court spoke of bans on possession for the “mentally ill,” it was referring to § 922(g)(4) and its definitions.
Finally, I fail to see how Tyler’s “lifetime ban” under § 922(g)(4) “calls into question the applicability of Heller’s presumption of lawfulness” to the statute. Lead Op. at 688. Section 925(c)’s relief-from-disabilities program is unavailable to individuals dispossessed under § 922(g)(1), just as it is unavailable to individuals dispossessed under § 922(g)(4). Nonetheless, we rely on Heller to dispossess felons— even if the individual committed a nonviolent felony and even if the crime happened thirty years in the past — because Congress chose to dispossess all felons in § 922(g)(1) and Heller described this prohibition as a “presumptively .lawful regulatory measure[ ].” 554 U.S. at 626, 128 S.Ct. 2783; see Carey, 602 F.3d at 741. This same reasoning applies to prohibitions on the “mentally ill,” and the lead opinion has not offered a meaningful distinction.
In sum, given Heller’s explicit language that “prohibitions on the possession of firearms by felons” are “presumptively lawful,” we have rejected Second Amendment challenges to § 922(g)(1) without inquiry into means-end scrutiny. Prohibitions on *717 possession by the “mentally ill” are included in the same sentence of Heller as prohibitions on possession by felons. Heller thus instructs that the Second Amendment is “specifically limited in the case of’ prohibitions on possession by the mentally ill. See Carey, 602 F.3d at 741; see also Heller, 554 U.S. at 626-27, 128 S.Ct. 2783. Because I do not believe that it is necessary to apply Greeno’s two-step framework, I would find § 922(g)(4) constitutional under Heller’s, own terms.
II.
A.
Assuming that the two-step framework of Greeno applies, I agree that we should review § 922(g)(4)- under intermediate scrutiny.-[2] I disagree, however, that a remand is necessary to resolve the question of whether. § 922(g)(4) withstands intermediate scrutiny because I believe that the government has met its burden.
To begin, I wholeheartedly agree, with the lead opinion that intermediate scrutiny is appropriate to evaluate challenges to possession prohibitions such as § 922(g)(4) because intermediate scrutiny requires the government to justify its firearm laws while simultaneously “giving [Congress] considerable flexibility to regulate gun safety.” Bonidy v. USPS, 790 F.3d 1121, 1126 (10th Cir. 2015); see Lead Op, at 692. But we should be mindful of the Second Amendment context in applying intermediate scrutiny, as well. As recently recog *718 nized, “the nature of firearms regulation requires ample deference to the legislature” under intermediate scrutiny because “[f]irearm policy is a ‘complex and dynamic’ issue implicating ‘vast amounts of data’ ” that “is either incomplete or influenced by partisanship.” Heller v. District of Columbia, 801 F.3d 264, 282 (D.C. Cir. 2015) (Henderson, J., concurring in part and dissenting in part) (internal quotations omitted). The legislature — as opposed to the judiciary — is “far better equipped ... to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks.” Id (internal quotation marks omitted). And significantly, in evaluating firearm laws, the consequences are- real. See id; see also Bonidy, 790 F.3d at 1126. Judicial restraint is particularly appropriate because “[w]e do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights.” United States v. Masciandaro, 638 F.3d 458, 475 (4th Cir. 2011). Here, I believe that the record contains sufficient evidence for our court to conclude that § 922(g)(4) is “substantially related” to the government’s compelling interests in preventing gun violence against others and, particularly, preventing firearm-related suicide. See Clark v. Jeter, 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988).
B.
First, § 922(g)(4) is substantially related to the government’s compelling interest in preventing gun violence against others. The government presented to the district court several studies demonstrating a link between mental illness and an increased risk of violence. See R. 23 (Mot. To Dismiss at 33-34) (Page ID #171-72). The link between involuntary commitments and firearm violence has also been borne out in empirical research relating to gun-control policy. As the States United to Prevent Gun Violence provides in its amicus brief, “when Connecticut began reporting records of mental health adjudications to the federal NICS database in 2007 — thereby preventing individuals with prior civil commitments, but no previously disqualifying criminal history, from passing a background check,” Connecticut “saw a 53% reduction in rates of violent crime perpetrated by such individuals.” See States United to Prevent Gun Violence Amicus Br. at 11.
Second, and more significantly, § 922(g)(4) is substantially related to the government’s compelling interest in preventing firearm-related suicide. The data related to suicide risk for individuals who are mentally ill — and, specifically, individuals previously subjected to an involuntary commitment — is stark. The government cited several empirical studies in its motion to dismiss in the district court demonstrating the link between mental illness, firearms, and suicide. For example, the government cited studies and articles suggesting that “[njinety percent (or more) of suicide victims in the United States suffered from mental illness.” R. 23 (Gov’t Mot. to Dismiss at 34 n.23) (Page ID #171) (quoting Frederick E. Vars & Amanda Ad-cock Young, Do the Mentally III Have a Right to Bear Arms?, 48 Wake Forest L. Rev. 1, 21 (2013)). A law review article relied upon by the government further reports that individuals released after involuntary commitments, specifically, had “a suicide risk thirty-nine times greater than expected.” Vars & Adcock Young, supra, at 696 (emphasis added); see also R. 23 (Gov’t Mot. to Dismiss at 35) (Page ID #172) (discussing higher rate of suicide *719 “among people who have previously been committed”).
Moreover, the government presented evidence about the disproportionately lethal rate of suicides involving firearms as opposed to suicides using other means. R. 23 (Gov’t Mot. to Dismiss at 35-36) (Page ID #172-73). As one report shows, although the total fatality rate for all methods of suicide is nine percent, the fatality rate for suicide by firearm is eighty-five percent. Means Matter, Lethality of Suicide Method, Harv. Univ. Sch. of Pub. Health, http:// www.hsph.harvard.edu/means-matter/ means-matter/case-fatality ' (last visited April 7, 2016); see Brady Ctr. to Prevent Gun Violence Amicus Br. at 11-13. This higher mortality rate is particularly troubling given that, as the government provides, “[hjaving a gun in the home [is] a strong risk factor for gun-related suicide ... but [is] inversely related to committing suicide with a nonfirearm method.” R. 23 (Gov’t Mot. to Dismiss at 35-36) (Page ID #172-73) (quoting Douglas J. Wiebe, Homicide and Suicide Risks Associated With Firearms in the Home: A National Case-Control Study, 41 Annals of Emergency Med. 771, 777 (June 2003)). “Importantly, not having a gun appears to deter a substantial number of suicide attempts altogether, rather than simply steering the victim to alternative means.” Vars & Ad-cock Young, supra, at 19 (citing Matthew Miller & David Hemenway, Guns and. Suicide in the United States, 359 New Eng. J. of Med. 989, 990 tbl. (2008)).
The government has also established that the permanent nature of the disability is substantially related to its compelling interests. In its motion to dismiss, the government presented evidence to the district court regarding the high rate of relapse for individuals who have previously been involuntarily committed. See R. 23 (Gov’t Mot. to Dismiss at 37) (Page ID #174). Given the strong potential for relapse, and the difficulty in determining which previously committed individuals will pose further danger to ■ themselves or others, Congress permissibly chose a broad prohibition. The rationale behind this policy choice is illustrated by Congress’s experience administering § 925(c)’s federal relief-from-disabilities program. Congress found that, under the program, “ATF officials [were] required to guess whether ... a person committed to a mental institution can be entrusted with a firearm,” and after “spending] many hours investigating ... there [was] no way to know with any certainty whether the applicant [was] still a danger to public safety.” H.R. Rep. No. 102-618, at 14 (1992). Congress recognized that if an ATF official made an incorrect determination, “a mistake could have devastating consequences for innocent citizens.” Id.
The lead opinion seemingly does not fault Congress for enacting, and then defending, § 925(c); rather, the lead opinion focuses on “Congress changfing] its mind” in 2008 when it enacted the NICS Improvement Amendments Act. See Lead Op. at 697. But it is unclear why Congress’s decision to enact this law in 2008 affects the analysis of § 922(g)(4). As the government argues, “Congress may permissibly enact laws more protective of constitutional rights than is required by the Constitution,” and its decision to do so does not mean that its original action was contrary to the Second Amendment.' See Federal Appellees Supp. Br. at 21. As discussed above, the government has provided evidence demonstrating that § 922(g)(4), as enacted, is substantially related to achieving the government’s compelling interest in preventing violence and suicide. That Congress chose to permit- forms of discretionary relief to disabled individuals — either federally or through the states — does not undermine this conclusion.
*720 The lead opinion emphasizes that the “NICS Improvement Amendments Act is a less restrictive alternative to the permanent bar created by § 922(g)(4).” Lead Op. at 697. But it is well settled that “intermediate scrutiny does not require that a regulation be the least intrusive means of achieving the relevant, government objective,” including when the law at issue relates to Second Amendment rights. Mas-ciandaro, 638 F.3d at 474. Moreover, 'the federal relief-from-disabilities program of § 925(e) is also “a less restrictive alternar tive to the permanent bar,” and thus, under the lead opinion’s reasoning, should similarly demonstrate that Congress does not feel that § 922(g)(4)’s disability should be permanent. Section 925(c)’s relief-from-disabilities program, however, applies to all of § 922(g)’s disabilities. If Congress’s decision to create a relief-from-disabilities program indicates Congress’s skepticism regarding the scope of the originally enacted law, as the lead opinion indicates, then Congress’s decision to enact § 925(c) should equally cast doubt on the scope,of each of § 922(g)’s disabilities. But this cannot be the case.
• At bottom, the NICS Improvement Amendments Act is not meaningfully different than other federal firearm provisions that permit a state to choose to restore rights to a state citizen prevented by federal • law. from owning a firearm based on a prior state-level adjudication. For example, under § 921 (a) (33) (B) (ii),, a person whose “conviction [for a domestic-violence misdemeanor] has been expunged or set aside” or who “has had civil rights restored” by a state “shall not be considered to have been convicted” of a misdemeanor crime of domestic violence for the purposes of federal firearm law. Section 921(a)(20) provides, substantially the same for felony convictions. See also McGrath v. United States, 60 F.3d 1005, 1009 (2d Cir. 1995) (explaining that, in enacting § 921(a)(20), “Congress sought to accommodate a state’s judgment that a particular person or class of persons is, despite a prior conviction, sufficiently trustworthy to possess firearms”). These provisions, like the NICS Improvement Amendments Act, are consistent with the overall purpose of the Qun Control Act of 1968, which is “to assist the States effectively to regulate firearms traffic within their borders.” H.R. Rep. No. 90-1577, at 4411 (1968); see Federal Appellees Supp. Br. at 20-21. Unlike the lead opinion, I cannot read Congress’s decision to allow states to choose to create a relief-from-disabilities program for persons, dispossessed by § 922(g)(4) as “a clear indication that Congress does not believe that previously committed persons are sufficiently dangerous as a class to permanently deprive” them of the right to bear arms. Lead Op. at 697. Congress’s decision to enact the NICS Improvement Amendments Act does not alter the fact that § 922(g)(4), as originally enacted, is constitutional. .
The government has established 'that individuals released from involuntary commitment have a higher rate of suicide than the general population, and that these numbers are substantial. See R. 23 (Gov’t Mot. to Dismiss at 35) (Page ID #172); see also Vars & Adcock Young, supra, at 695. The government has demonstrated that ownership of a firearm is a risk factor for suicide and' that firearms are disproportionately lethal as compared to other means. See R. 23 (Gov’t Mot. to Dismiss at 35-36) (Page ID #172-73). The government has also provided research related to the rate of relapse for individuals who have been involuntarily committed, see id. at 37 (Page ID #174), and has persuasively demonstrated the difficulty inherent in making individualized assessments of dangerousness based on a past history of mental illness. See Federal Appellees *721 Supp. Br. at 14; see also H.R. Rep. No. 102-618, at 14. “These established facts along with logic and common sense” demonstrate “that the government has carried its burden of establishing a reasonable fit between the substantial government objective of reducing” firearm violence and. prohibiting individuals with prior involuntary commitments from possessing firearms. See United States v. Staten, 666 F.3d 154, 167 (4th Cir. 2011). Under intermediate scrutiny, this' analysis does not change simply because Congress could' have selected narrower alternatives. As the Ninth Circuit recognized in upholding § 922(g)(9)’s permanent dispossession of domestic-violence misdemeanants in the face of a Second Amendment challenge, Congress “could have easily created a limited duration rather than lifetime ban,” or Congress “could have created a good behavior clause under which individuals without new domestic violence arrests or charges within a certain number of years of conviction would automatically regain their rights to possess firearms.” United States v. Chovan, 735 F.3d 1127, 1142 (9th Cir. 2013). “But Congress did not do so.” Id. The same is true here. Certainly, Congress could have enacted a firearm disability that disarmed only individuals who are currently involuntarily, committed, or Congress could have limited § 922(g)(4)’s disability to individuals involuntarily committed within the last ten, twenty, or thirty years. The question under intermediate-scrutiny review is whether the law that Congress did enact is substantially related to the government’s interests, not whether it is the least restrictive law or the wisest policy decision. See Turner Broad. Sys., Inc. v. FCC, 520 U.S. 180, 217-18, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997).
C.
In enacting § 922(g)(4), “Congress permissibly created a broad statute,” with an “express intent to establish a ‘zero tolerance policy’ towards guns” and individuals with a demonstrated history of mental illness. See Chovan, 735 F.3d at 1142. Under intermediate scrutiny — and mindful of the context within which we- evaluate this law — I believe that the government has demonstrated that § 922(g)(4) is substantially related to Congress’s objectives of reducing the substantial homicide and suicide rates caused by firearms. I would therefore hold that § 922(g)(4) is constitutional under intermediate-scrutiny review without any need to remand to the district court for further evidentiary development. For these reasons, and for the reasons expressed in Part I, supra, I respectfully dissent.

. According to Professor Larson, the' first state law providing for felon disarmament "was enacted in New York in 1897,” with others following in the beginning of the 20th ' century. Carlton F.W. Larson, Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit,. 60 Hastings L,J. 1371, 1376 (2009). Thus, even using the earliest state law as a basis, felon-dispossession statutes did not exist at the time of the Second Amendment's ratification and, at the most, are only three years removed from being of "20th century vintage” themselves. See Skoien, 614 F.3d at 641.

. Judge Sutton’s concurrence eschews a means-ends analysis and remarks that, because the problem is one' of "misidentification,” “[t]iers of review, have nothing to clo with it.” Sutton Concurring Op. at 710. This is incorrect. As stated infra, in enacting § 922(g), Congress intended to reduce firearm-related homicide and suicide. See R. 23 (Gov’t Mot. to Dismiss at 33-34) (Page ID #170-71). In so doing, Congress prohibited firearm possession for certain categories of individuals, including those who pose a po- . tential risk for firearm violence based on a demonstrated history of mental illness. As discussed supra, Congress did not choose to enact in § 922(g) a "free floating prohibition" on possession by individuals who are currently "mentally ill and dangerous.” Rehlander, 666 F.3d at 50. Rather, Congress chose two ■ categories — rooted in "prior judicial proceedings” — "to establish status” for the purposes of the statute, id. (emphasis omitted): individuals "who ha[ve] beeri adjudicated as a mental defective” and individuals "who ha[ve] been committed to a mental institution.” § 922(g)(4). It is undisputed that Tyler falls into the latter category; hé has not been misidentified. The question for our court to answer is whether Congress’s chosen categories of dispossession — and Congress’s chosen length of dispossession — are sufficiently related to Congress’s interest. This is a question of means-ends scrutiny, and it is a question that our court is well equipped to handle.
Further, in avoiding a scrutiny inquiry, Judge Sutton’s concurrence makes much of the "unrebutted evidence” that Tyler has presented “that he is not a risk to himself or ' others today.” See Sutton Concurring Op. at 710. This overstates the posture of this case and the evidence in the record. T&ler’s complaint says only the following about his mental condition: (1) that in 1986, he was involuntarily committed, and (2) that he "currently is not a risk to himself or to other people and .does not have issues with substance abuse.” R. 1 (Compl. at 6) (Page ID #6). Tyler’s complaint refers to two. attached medical evaluations. Id. The first reports that Tyler has average cognitive ability and “no evidence of thought disorder,” but notes that one administered test was "rendered invalid.” R. 1-1 (Osentoski Eval. at 2) (Page ID #20). The report concludes that "[tjhere is no evidence of mental illness within this evaluation.” Id. The second medical evaluation reports that "[f|rom all the information [Tyler] provided it does not appear that [Tyler] has a substance abuse problem.” R.l-1 (Rozelle Eval. at.3) (Page ID #24). This is hardly "plenty of evidence,” see Sutton Concurring Op. at 713, and because we confront this issue in the context of a motion to dismiss, see R. 23 (Gov’t Mot. to Dismiss) (Page ID #124), there is an understandable lack of rebuttal evidence in the record regarding Tyler’s condition. .