DISSENT BOGGS, Circuit Judge, dissenting. Domestic violence has been, and continues to be, a serious problem in this country. The question before this court, however, is not whether the government has a compelling interest in curbing the incidence of domestic firearm violence. We all agree that it does. Nor is it whether the government can, under certain conditions, limit the federal firearm rights of some domestic violence misdemeanants. We all agree that it can, Rather, the question is whether the government has satisfied its burden of showing that the restriction imposed by 18 U.S.C. § 922(g)(9) appropriately fits its stated objective. Because the government has offered, at best, minimal evidence that a non-recidivist domestic violence misdemeanant presents a heightened risk of reoffending decades after his or her conviction, it has yet to justify what,is, effectively, a lifetime ban on a fundamental constitutional right. I therefore respectfully dissent. I As the majority notes, we apply the two-step test from United States v. Greeno, 679 F.3d 610 (6th Cir. 2012), when considering Second Amendment challenges. Tyler v. Hillsdale Cty. Sheriff’s Dep’t, 837 F.3d 678, 685 (6th Cir. 2016) (en banc). At the first step, we ask “whether the challenged law burdens conduct that falls within the scope of the Second Amendment right, as historically understood.” Greeno, 679 F.3d at 518. Because I agree with my colleagues that “the government has not demonstrated that the Second Amendment, as historically understood, excludes individuals who had abused family members or intimate partners,” Majority Op. at 205, and because the government bears the evidentiary burden, we proceed to the second stage of the analysis, Greeno, 679 F.3d at 518. There, we scrutinize “the strength of the government’s justification for restricting or regulating the exercise of Second Amendment rights,” applying the appropriate level of scrutiny. Ibid. (quoting Ezell v. City of Chicago, 651 F.3d 684, 703 (7th Cir. 2011)). While I have expressed my view that strict scrutiny should apply to Second Amendment restrictions, see, e.g., Tyler, 837 F.3d at 702 (Boggs, J., concurring in most of the judgment) (“The proper level of scrutiny is strict scrutiny, as with other fundamental constitutional rights.... ”), I will accept, arguendo, my'colleagues’ contention that intermediate scrutiny is warranted in this case. Given this assumption, the majority is correct that the critical question here is “whether the government has established a ‘reasonable fit’ between its compelling objective of preventing gun violence, and domestic gun violence specifically, and disarming misdemeanants convicted of domestic abuse.” Majority Op. at 207. Where the majority errs is in failing to recognize that the question of fit has a temporal component. In Tyler, we held that when a firearm-ownership ban is “effectively permanent,” “some evidence of the continuing need to disarm ... is necessary to justify [the ban’s] means to its ends.” 837 F.3d at 694 (emphasis added). This requirement rests on the fact that the reasonableness of fit depends, in part, on the relative size of the set of “true positives” to that of “false positives.” The first contains all people to whom the firearm ban applies and whose disarmament furthers the government’s compelling objective, while the second contains those who are prevented from obtaining a firearm but who would not misuse one. Where the latter group is large relative to the former, the fit is poor—not just imperfect—and is, therefore, likely to be unreasonable. The length of the ban matters because as an individual ages, he or she might transition from the former category into the latter. Thus, the longer the ban, the worse the fit is likely to be. As a practical matter, § 922(g)(9) imposes a permanent ban on Stimmel and on persons similarly situated. Congress has provided domestic-violence misdemeanants with four avenues to restore their federal firearm rights: (1) have the conviction set aside, (2) have the conviction expunged, (3) have their civil rights restored (assuming that the law of the applicable jurisdiction provides for the loss of civil rights for such an offense), or (4) seek a pardon.[1] 18 U.S.C. § 921 (a)(83)(B)(ii). However, as my colleagues acknowledge, under Ohio law, neither civil-rights restoration nor ex-pungement is available to those' convicted of misdemeanor domestic violence as an adult.- Majority Op. at 207 n.7. Furthermore, while Ohio does have a procedure for setting aside convictions, it is limited to cases involving a “manifest injustice.” Ohio Crim. R. 32.1. Given that “a postsentence withdrawal motion is allowable only in extraordinary cases,” and because an “undue delay between the occurrence of the alleged cause for withdrawal and the filing of the motion is a factor adversely affecting the credibility of the movant and militating against the granting of the motion,” State v. Smith, 49 Ohio St.2d 261, 361 N.E.2d 1324, 1326 (1977), this route is also essentially foreclosed to Ohio domestic-violence misdemeanants who are seeking to restore their federal firearm rights decades after offending. Thus, Stimmel’s only potential avenue to reacquiring those rights is to seek a pardon. Gubernatorial pardons are, however, uncommon events in Ohio. See, e.g., Alan Johnson, Kasich Stays Conservative With Pardons, Columbus Dispatch, Feb. 12, 2017, http://www. dispatch.com/news/20170211/kasieh-stays-conservative-with-pardons (stating that in 2016, roughly three percent of clemency requests were approved, mostly for nonviolent crimes); see also Restoration of Rights Project, Ohio Restoration of Rights, Pardon, Expungement & Sealing, http://ceresourcecenter.org/state-restoration-profiles/ohio-restoration-of-rights-pardon-expungement-sealing (last visited Jan. 3, 2018). Nor does there appear to be much urgency to pardon those convicted long ago of domestic violence crimes, albeit misdemeanors. Cf. United States v. Skoien, 614 F.3d 638, 653 (7th Cir. 2010) (Sykes, J., dissenting). Stim-mel’s firearm-ownership ban is therefore effectively permanent, meaning that some evidence of the continuing need to disarm those long ago convicted of misdemeanor domestic violence is necessary to justify § 922(g)(9)’s severe restriction. None of the government’s evidence establishes such a continuing need; in fact, the only direct evidence that is proffered contradicts the government’s claim. As the majority concedes, after twenty years, “violent criminals present [only] a slightly higher risk of arrest than those without criminal records.” Majority Op, at 208 (emphasis added) (citing Blumstein & Nakamura, supra, at 341-43). Admittedly, the cited study does not further refine this statistic, so we do not know whether it is true of domestic-violence misdemeanants. However, it doés provide prima facie evidence that after a substantial passage of time, such individuals are about as likely as the general public to commit an act of domestic violence. This data point is problematic for the government, because even under intermediate scrutiny, “[t]he burden of justification is demanding and ... rests entirely on the State.” Tyler, 837 F.3d at 693-94 (alteration in original). The government’s remaining evidence does nothing to refute this presumption. The other studies cited by the government, for instance, have timeframes that are too short to be relevant to the issue before us. The Cincinnati study lasted for only three years, see Majority Op. at 207-08, while the Stover article—which is the source of the much-touted 40%-to-80%-recidivism-rate statistic—based this figure upon experiments that lasted, at most, five years, see Stover, supra, at 450; Shepard, supra, at 167; Joel Garner, Jeffrey Fagan, & Christopher Maxwell, Published Findings from the Spouse Assault Replication Program: A Critical Review, 11 J. Quantitative Criminology, 3, 20 (Table V) (1995). Thus, these studies do not provide a basis for concluding that domestic violence mis-demeanants pose a heightened risk decades after their offense. Many of the government’s “additional relevant data points” are not, in fact, relevant; they merely state the rather obvious facts that domestic violence is a serious problem in the United States and that the presence of a firearm increases the risk of death. See Majority Op. at 209-10. Taken together, such, evidence suggests that having a firearm in the household increases the likelihood of homicide if domestic violence occurs. Such a conditional statement, however, cannot show that a given subset of the population—namely, domestic-violence misdemeanants who, decades' later, have not reoffended—is more likely to use a firearm against a domestic partner than the general public. To do that, the government would have to. demonstrate that those convicted of domestic-violence misdemeanors decades earlier commit acts of domestic violence at higher rates than' the general public; and as shown above, it fails to do so. In short, the government cannot advert to facts that hold true of the population at-large to carry its burden of showing that a substantial relationship exists between § 922(g)(9) and the compelling government objective of curbing domestic firearm violence..- II As the record currently stands, the government'has not carried its burden even under intermediate scrutiny. Following Tyler’s lead, I would therefore reverse and remand, noting that the government may still justify § 922(g)(9) either by providing evidence “explaining the necessity of § 922(g)[ (9) ]’s [effective] lifetime ban or ... [by] showing that § 922(g)[ (9) ] is constitutional as applied to” Stimmel. 837 F.3d at 699. Perhaps such evidence exists; this court, however, cannot relieve the government of its burden to provide it. . For the sake of completeness, it bears noting that the Gun Control Act includes a relief-from-disabilities program which permits a barred individual to "make application to the Attorney General for relief;” and should thát application be denied, judicial review is available in federal district court. 18 U.S.C. § 925(c). This section of the Act is, however, "currently a nullity” as Congress defunded the program in 1992, which, in turn, stripped the federal courts of jurisdiction to review § 925(c) claims. Tyler, 837 F.3d at 682.